ELIZABETH BRITTELL *v.* DEPARTMENT
OF CORRECTION ET AL.
(SC 15829)

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.

Argued April 30—officially released September 22, 1998

*Markus L. Penzel*, for the appellant (plaintiff).

*Terrence M. O'Neill*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Jane B. Emons*, assistant attorney general, for the appellee (named defendant).

*Ruth L. Pulda* and *Deborah L. McKenna* filed a brief for the Connecticut Women's Education and Legal Fund as amicus curiae.

*Opinion*

PALMER, J. The plaintiff, Elizabeth Brittell, formerly a correction officer employed by the named defendant, the department of correction,[1] brought this damages action claiming that the defendant: (1) failed to take proper steps to remedy a sexually hostile working environment in violation of the Fair Employment Practices Act, General Statutes § 46a-51 et seq.; and (2) constructively discharged her from her employment as a correction officer. The trial court, *Barnett, J.*, rejected the plaintiff's claims and rendered judgment for the defendant. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book § 65-1, and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The trial court's findings may be summarized as follows. In July, 1990, the plaintiff was hired by the defendant as a correction officer and assigned to the New Haven Community Correctional Center (correctional

---

[1] The American Federation of State, County and Municipal Employees, Local 1565 (union) also was a defendant in this action. Before trial, however, the plaintiff and the union reached a settlement. Accordingly, references in this opinion to the defendant are to the department of correction.

center).[2] Before commencing her duties at the correctional center in August, 1990, the plaintiff, along with five other women and approximately thirty men, attended a six week training course at the defendant's training academy.[3]

One day, while the plaintiff was attending the academy, someone observed that she appeared to be in a hurry and asked her whether she had a date. In response, one of the plaintiff's male classmates, Tracy Felton, remarked that the plaintiff did not date men and that she liked women. The plaintiff told Felton that if she ever heard him make such a statement again, she would slap him. The plaintiff, however, did not report Felton's comment to any of the defendant's supervisory personnel until the spring of 1992.

Within one or two months after the plaintiff started working at the correctional center, she began to hear comments from inmates concerning her sexuality, expressed in obscene terms, implying that she had had a sex change operation and that she had male genitalia. The plaintiff, however, took no action regarding these comments at that time.

Approximately one year later, in August, 1991, the plaintiff, while supervising a bible study class in the prison gymnasium, overheard some unidentified inmates, who were located outside the gymnasium door, state that they planned to sexually assault "the half-man homo" to determine her sex. The plaintiff, who believed that the inmates were speaking about her, orally reported the incident to the duty officer, Captain Moses Riddick, but omitted any reference to the threatened sexual assault. She also told Riddick that there

[2] The correctional center houses both maximum and minimum security risk inmates.

[3] The training program included, among other things, instruction on issues relating to sexual harassment and on how to deal with abusive treatment from inmates.

were rumors circulating in the prison that made it uncomfortable for her to work there.

On August 13, 1991, an inmate, Thomas Trimmer, who previously had sworn at the plaintiff and verbally threatened her with physical violence, asked the plaintiff whether it was true, as one or more correction officers had told him, that "you are not a woman . . . you are in fact a man and . . . you had a sex change operation." Trimmer, however, declined to provide the plaintiff with the name of the officer or officers who purportedly had made such comments, suggesting only that she should consider whether the officer who relieved her when she worked in "Charlie Unit"[4] might be responsible for the rumor. The plaintiff promptly brought the matter to the attention of her immediate supervisor, Lieutenant Carolyn Moore, who stated that she had not heard any comments or rumors of this nature. Moore nevertheless questioned four correction officers about the rumors. According to Moore's incident report, one of the officers had heard the rumors from unspecified inmates a month or more prior to being questioned by Moore; the other officers knew nothing of the rumors except what they had been told by the plaintiff.[5] On Moore's advice, the plaintiff also filed an incident report detailing Trimmer's comments and indicating that she had heard similar comments in the past from several other inmates.

After the plaintiff lodged her complaint, Major Thomas Langner took a statement from Trimmer, but decided not to speak to any other inmates in Trimmer's

---

[4] The term "Charlie Unit" refers to cellblock "C."

[5] The trial court's memorandum of decision contains no mention of the four interviews conducted by Moore or of the incident report Moore filed regarding those interviews. The plaintiff, however, does not dispute the fact that Moore questioned the four correction officers regarding the rumors reported to her by the plaintiff. We note that Moore was deceased at the time of the trial in this case.

cellblock about the matter for fear that any such inquiry could lead to further rumors or comments.[6] Langner also reported the incident to Deputy Warden Donald Arasimowicz by memorandum. Arasimowicz met with the plaintiff later in August and summarized the meeting in a memorandum to Warden Robert Gillis on August 29, 1991. In his memorandum, Arasimowicz noted that, according to the plaintiff, the sexually harassing comments had abated, but the plaintiff feared a renewal of the rumors when she changed posts. Arasimowicz also noted that all staff had been admonished "regarding . . . possible consequences of any 'harassing' statements or actions made to or about fellow staff [persons]." He further indicated that he had advised the plaintiff to report any continued harassing behavior to her supervisors,[7] and that he intended to speak with her again to monitor the situation.[8] Finally, Arasimowicz reported that the plaintiff had declined the help of the employee assistance program[9] because of the support that she already had received from her supervisors. At this point, Gillis decided not to investigate the plaintiff's complaint further, largely because the reports he had reviewed failed to identify any officers or other employees responsible for the rumors.[10]

---

[6] At trial, Langner testified that he recalled that only inmates, and not staff, were alleged to have been spreading the rumors about the plaintiff. Moreover, a memorandum that Langner received from Captain Riddick regarding Trimmer's comments stated that the plaintiff had reported Trimmer's comments to Riddick in a joking manner.

[7] Following the August, 1991 incident, the plaintiff periodically asked her supervisors whether they had heard malicious rumors or comments about her from inmates or other correction officers. The plaintiff's supervisors indicated that they had not heard any such rumors or comments.

[8] Arasimowicz, however, was transferred to another prison facility in September, 1991.

[9] The defendant's employee assistance program provides counseling referrals, substance abuse treatment and advice concerning opportunities for legal redress in certain circumstances.

[10] We note that, at the time of the plaintiff's August, 1991 incident report, the defendant did not have in place an official policy regarding sexual harassment. The defendant's employee handbook, however, contained a

At the end of March, 1992, Vernetha Gibson, a correction officer, cautioned the plaintiff that she should be careful when working in the cellblock because correction officers Felton and Kenneth Barnes had aroused the curiosity of the inmates by making comments about the existence and size of the plaintiff's supposed male genitalia. The following day, the plaintiff reported Gibson's comments to Major Mario Pizighelli, who, in a memorandum to Warden Gillis summarizing his meeting with the plaintiff, stated that the plaintiff had attributed the comments to staff, but had declined, at that time, to provide any names. Shortly thereafter, on April 2, Pizighelli issued a notice to all employees that defined sexual harassment,[11] and warned that "[a]ny employee found to have engaged in sexual harassment or to be found negligent in pursuing appropriate action may be subject to disciplinary action." A similar notice was read at roll call for seven consecutive days.

On April 22, 1992, the plaintiff filed a written complaint with Warden Gillis. In her complaint, the plaintiff

provision forbidding employees from "discuss[ing] other employees with or in the presence of inmates," or permitting inmates to engage in such discussions. Violation of the handbook rules provided grounds for disciplinary action. In addition, the warden had discretion whether to refer a matter involving sex discrimination to the defendant's affirmative action unit. On November 18, 1991, the defendant adopted an official policy prohibiting sexual harassment and requiring that unit administrators refer all sexual harassment complaints to the affirmative action unit, which, under the new policy, was responsible for investigating all complaints.

[11] The notice provided as follows: "Employees shall not engage in sexually harassing conduct. Conduct which shall constitute sexual harassment includes but is not limited to:

"a. Any sexual flirtation, touching, advance or proposition;

"b. Verbal abuse of sexual nature;

"c. Any graphic or suggestive comment about an individual's dress or body;

"d. Sexually degrading words to describe an individual;

"e. The display in the workplace of sexually suggestive objects or pictures, including nude photographs;

"f. Making a comment and/or circulating a rumor which embarrasses, ridicules or demeans a person because of the individual's gender or sexual orientation; or

reported that, for the preceding one and one-half years, she had been the subject of sexually harassing comments by unnamed officers and inmates, and provided six examples of the harassing behavior. The plaintiff claimed that these comments constituted a challenge to her authority, thereby placing her in "near and present" danger. She requested that she be removed from contact with the general inmate population until the rumors ceased and the officers responsible were disciplined. The plaintiff noted, moreover, that she never received a status report concerning the written complaint that she had filed in August, 1991.[12]

On April 23, 1992, the plaintiff, at the conclusion of inmate visiting hours, notified the person who was visiting inmate Douglas Franklin that it was time to leave. Franklin responded by calling the plaintiff a "half-man" and referring to her in obscene terms. Franklin's visitor, while departing, uttered a similar comment. Once outside the presence of Franklin, the plaintiff became emotionally distraught, reported the incident to Administrative Captains T.A. Cleveland and D.P. Barile, announced that she could not continue in her current position and left the correctional center on medical leave.

The plaintiff met with Major Pizighelli on April 28, 1992, informed him that she had sought psychiatric help through the employee assistance program and provided him with the names of three correction officers, Gibson, Barnes and Ricardo Flores, whom she believed might be able to identify the officers responsible for circulating the rumors concerning her sexuality. Pizighelli interviewed all three officers by May 6. Gibson and Barnes

"g. Any threat or insinuation, either explicitly or implicitly, that employee's refusal to submit to sexual advances shall adversely affect the employee's employment, evaluation, wages, advancement, assigned duties, or any other condition of employment."

[12] According to the plaintiff, Major Pizighelli had informed her that the paperwork regarding the status of the complaint was misplaced.

categorically denied any knowledge of the rumors.[13] Flores stated that, although he thought he recalled hearing some derogatory comments about the plaintiff at roll call, he could not remember either the nature of the comments or the identity of the person or persons who had made them.

In the meantime, Captain Barile had interviewed Franklin, who admitted that he had accused the plaintiff of being a man. Franklin, who subsequently was disciplined for his statement about the plaintiff, further stated that he had heard this rumor from other unnamed inmates, but not from any staff members. Barile notified Major Pizighelli of the interview by memorandum in early May, 1992. In his memorandum, Barile stated that he had asked the plaintiff, after the August, 1991 incident, whether she had heard any additional sexually harassing comments. According to Barile, the plaintiff informed him that she had heard such comments on one or two occasions, but was unable to attribute the statements to any particular inmate or employee. Captain Cleveland also sent a memorandum to Pizighelli, dated May 4, 1992, stating that the plaintiff had asked Cleveland in March, 1992, whether she had heard any rumors concerning the plaintiff. Cleveland informed the plaintiff that she had not. According to Cleveland, the plaintiff told her that a correction officer whom the plaintiff believed to be Barnes had called her a "half-man" in the presence of inmates, that the matter had been investigated and that there had been no further problems until the incident involving Franklin in April, 1992.

---

[13] At trial, however, Barnes testified that he had lied to Pizighelli due to pressure from the union. He stated that the rumors about the plaintiff were generated by officers who were in the plaintiff's class at the training academy, and that employees holding management positions with the defendant— i.e., persons with the rank of lieutenant or higher—had participated in spreading the rumors. Barnes was dismissed by the defendant in 1993 following a conviction for receiving stolen property.

Major Pizighelli notified Warden Gillis by memorandum of the incident involving Franklin. Gillis wrote to the plaintiff on May 4, 1992, summarizing the measures that were taken in response to the sexually harassing conduct and noting, in particular, the memoranda concerning sexual harassment that were issued to all employees and read at roll call. Gillis also acknowledged the ongoing difficulty in establishing the identities of any employees responsible for the rumors and encouraged the plaintiff to bring any additional information to the attention of the administration.

Major Pizighelli met with the plaintiff again on May 7, 1992, and informed her that a representative of the employee assistance program had notified him that, in light of the plaintiff's psychological condition, she should not return to work. Consequently, the plaintiff was placed on medical leave on May 9. At one of the meetings between the plaintiff and Pizighelli, the plaintiff mentioned that she suspected that officer Felton was one of the employees who had been spreading the offensive rumors. Felton, however, was out of work due to a work-related injury and, therefore, was not interviewed regarding the rumors.

When the plaintiff returned to work at the correctional center at the end of May, 1992, she was assigned to a position at the guardhouse, away from the inmate population.[14] Later, while the plaintiff was posted at central control, a jacket that she owned disappeared. The plaintiff subsequently found the jacket and, at around the same time, received a threatening telephone call.[15]

---

[14] Prior to taking medical leave in May, 1992, the plaintiff had observed graffiti inside the prison, as well as a small, hermaphroditic figure that was accompanied by the word "he man" and scratched into the wall of a shack located near the guardhouse gate, both of which she believed referred to her.

[15] As a consequence of the telephone call, the plaintiff became frightened and refused to obey an order from a superior officer to supervise the feeding of inmates in one of the prison dormitories.

In the meantime, the plaintiff, on April 30, 1992, had contacted the affirmative action unit[16] and, on May 18, followed up by filing a formal complaint. At a meeting on May 14 between the plaintiff and Ana Scott and Michelle Garvey of the affirmative action unit, the plaintiff asked them to interview eight correction officers, including Gibson, Barnes and Felton, and several supervisory personnel, including Lieutenant Moore and Captains Barile and Riddick. Scott and Garvey commenced the interviews on August 6, 1992, questioning nearly all the persons whose names the plaintiff had provided. They did not interview Gibson, however, because the plaintiff had informed them that Gibson was threatened by Barnes and, as a consequence, refused to confirm even the existence of the rumors. They also did not interview Felton because he was not at work due to his work-related injury.

Although all the correction officers who were interviewed denied being a source of the sexually harassing rumors about the plaintiff, most acknowledged the existence of such rumors. Furthermore, one of the employees acknowledged that officer Barnes had repeated certain rumors about the plaintiff, but the employee declined to provide a formal statement to that effect.[17] At least one of the correction officers stated that the rumors had originated at the training academy and had followed the plaintiff to the correctional center. The officers also indicated that the rumors were spread by inmates and officers whose names they either did not

[16] In addition, Warden Gillis had contacted the employee assistance program about the sexually harassing rumors, and a representative of that program also contacted the affirmative action unit. Under the provisions of the defendant's sexual harassment policy, however, the defendant was required to report any complaints of sexual harassment directly to the affirmative action unit.

[17] Without such a statement, the terms of the contract between the state and the union precluded the state from taking any disciplinary action against Barnes.

know or had forgotten. The supervisors, by contrast, stated that they had not heard the rumors about the plaintiff except from the plaintiff herself.

On the basis of these interviews, Scott and Garvey, although unable to ascribe the rumors to any particular employee, confirmed the existence of the sexually harassing rumors and comments, and concluded that they had originated at the training academy.[18] In accordance with these findings, and prior to preparing their report, Scott and Garvey offered to recommend a transfer for the plaintiff to any institution of her choice within the department of correction. The plaintiff, however, was not amenable to this suggestion.

Thereafter, on August 13, 1992, Scott and Garvey recommended to Warden Gillis that the plaintiff be offered a transfer, on a "first available" basis, to another institution within a reasonable commuting distance of New Haven, where the plaintiff resided. Specifically, they recommended that she be given a choice to transfer to another correctional facility in New Haven or to any one of four such facilities in Cheshire. Because a transfer to one of these institutions would have required a somewhat longer commute for the plaintiff, who did not own a car, Scott and Garvey provided the plaintiff with information concerning car pools from New Haven to those institutions. The plaintiff, however, rejected the idea of a transfer, stating as reasons that she had a new apartment, she did not have a car and her mother lived nearby.

Sometime in August, 1992, however, the plaintiff, without Warden Gillis' knowledge, applied to the deputy warden for a transfer to Camp Hartell in Windsor Locks, a facility for persons convicted of certain white collar

---

[18] Neither the affirmative action unit nor Warden Gillis, however, sought to interview the correction officers who had attended the training academy at the same time as the plaintiff.

offenses and driving under the influence. Moreover, subsequent to the submission of the affirmative action unit's report, and while the plaintiff was on medical leave, Diane Pierpont, an employee of the defendant's personnel department who was unaware of the plaintiff's request for a transfer to Camp Hartell, discussed the possibility of a transfer with the plaintiff, mentioning the Cheshire facilities and the womens' prison facility in Niantic.[19] The plaintiff, however, declined a transfer, citing as reasons certain medical problems and the fact that she did not own a car.

After Warden Gillis received the affirmative action unit's report and recommendations, he considered the investigation to be closed. He informed the plaintiff that, because she was no longer on leave, she would be required to return to the six week rotation cycle applicable to all correction officers, which would, once again, put her in contact with the inmate population. In accordance with the recommendation of the affirmative action unit, however, Gillis proposed that the plaintiff accept a transfer to another institution. The plaintiff, however, voiced concern over the possibility that officers and inmates from the correctional center also might be transferred to the same institution as the plaintiff, which could lead to a recurrence of the rumors. The plaintiff, therefore, declined to return to work and, on August 24, 1992, applied for medical leave. The defendant granted her request the following day. The plaintiff continued on unpaid medical leave[20] until April, 1994, when, due to her failure to submit the necessary

[19] With the exception of hardship cases, the contract between the defendant and the union provides that any transfer between institutions is subject to seniority rights. Pierpont sought and received authorization to offer the plaintiff a hardship transfer to Niantic.

[20] In March, 1993, the plaintiff filed a workers' compensation claim, alleging that the rumors regarding her sexuality had brought on depression that necessitated regular medication and psychotherapy. The plaintiff ultimately settled her claim for $62,000.

medical documentation, she was considered to have resigned.

After having first procured the statutorily required release from the commission on human rights and opportunities; see General Statutes §§ 46a-100[21] and 46a-101 (a);[22] the plaintiff commenced this action seeking damages and other relief[23] from the defendant for alleged employment discrimination and sexual harassment in violation of General Statutes §§ 46a-60 (a) (1) and (8)[24] and 46a-70.[25] Specifically, she claimed that the

[21] General Statutes § 46a-100 provides: "Discriminatory employment practices. Cause of action upon release from commission. Any person who has timely filed a complaint with the Commission on Human Rights and Opportunities in accordance with section 46a-82, alleging a violation of section 46a-60 and who has obtained a release from the commission in accordance with section 46a-101, may also bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the respondent transacts business, except any action involving a state agency or official may be brought in the superior court for the judicial district of Hartford-New Britain."

[22] General Statutes § 46a-101 (a) provides: "No action may be brought in accordance with section 46a-100 unless the complainant has received a release from the commission in accordance with the provisions of this section."

[23] The complaint also sought attorney's fees, costs and prejudgment and postjudgment interest.

[24] General Statutes § 46a-60 provides in relevant part: "Discriminatory employment practices prohibited. (a) It shall be a discriminatory practice in violation of this section:

"(1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex . . .

"(8) For an employer, by himself or his agent, for an employment agency, by itself or its agent, or for any labor organization, by itself or its agent, to harass any employee, person seeking employment or member on the basis of sex. 'Sexual harassment' shall, for the purposes of this section, be defined as any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when . . . (C) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment . . . ."

[25] General Statutes § 46a-70 provides in relevant part: "Guarantee of equal employment in state agencies. (a) State officials and supervisory personnel

dissemination of rumors pertaining to her sexuality by inmates and staff created a hostile work environment. She contended, moreover, that the defendant, by virtue of its failure to investigate adequately her complaints of sexual harassment and to take appropriate and effective remedial action, was liable for the harassment. She further asserted that her departure on permanent medical leave constituted a constructive discharge because the working conditions that she faced became so difficult that a reasonable person similarly situated would have felt compelled to leave the employ of the defendant.[26] After a trial to the court, the court determined that, although the plaintiff established that she had been subjected to sexually harassing conduct resulting in an abusive or hostile work environment,[27] she had failed to prove that the defendant was liable for the harassment. Noting that the plaintiff must show that the employer knew or should have known of the harassment and failed to take prompt, adequate remedial action to

---

shall recruit, appoint, assign, train, evaluate and promote state personnel on the basis of merit and qualifications, without regard for . . . sex . . . .

"(b) All state agencies shall promulgate written directives to carry out this policy and to guarantee equal employment opportunities at all levels of state government. They shall regularly review their personnel practices to assure compliance.

"(c) All state agencies shall conduct continuing orientation and training programs with emphasis on human relations and nondiscriminatory employment practices.

"(d) The Commissioner of Administrative Services shall insure that the entire examination process, including qualifications appraisal, is free from bias.

"(e) Appointing authorities shall exercise care to insure utilization of minority group persons."

General Statutes § 46a-69 provides: "Discriminatory practices by state. It shall be a discriminatory practice to violate any of the provisions of sections 46a-70 to 46a-78, inclusive."

[26] The plaintiff's complaint originally did not include a count alleging constructive discharge. At the conclusion of the trial, however, the court granted the plaintiff permission to file an amended complaint including that claim.

[27] The defendant has not challenged this determination for purposes of this appeal.

impute liability to the defendant, the trial court determined that, although the defendant had notice of the harassment, the plaintiff did not demonstrate that the remedial measures the defendant had taken, including its offer of a transfer,[28] were inadequate. The trial court also rejected the plaintiff's constructive discharge claim on the ground that the defendant had offered the plaintiff the opportunity to transfer to any one of a number of other correctional institutions within the general vicinity of her home, but the plaintiff had declined these offers.

On appeal, the plaintiff renews her claims that the trial court was required to find, as a matter of law, that: (1) the defendant failed to take adequate steps to investigate and remedy the sexual harassment in violation of the Fair Employment Practices Act; and (2) she was constructively discharged from her employment with the defendant. We disagree and, consequently, we affirm the judgment of the trial court.

I

The plaintiff first claims that the trial court improperly determined that liability for the sexual harassment could not be imputed to the defendant because she failed to establish that the defendant's remedial

---

[28] The plaintiff challenges the trial court's factual finding that the defendant offered to transfer her to any other state correctional facility. At trial, the plaintiff testified that the only discussion concerning transfers that she recalled occurred in May, 1992, when she met with Scott and Garvey, who, according to the plaintiff, recommended that she consider Camp Hartell. She also points out that she never received anything in writing concerning a transfer, and that the recommendations for transfers in the affirmative action unit's report do not include either Camp Hartell or Niantic. With respect to Niantic, she contends that if the defendant did make such an offer, it did not occur in September, 1992, as the defendant asserts, but, instead, no earlier than May, 1993, when it was mentioned in a memorandum from Scott to Warden Gillis. The trial court, however, evaluated the conflicting evidence on this issue and chose to credit the evidence adduced by the defendant.

response to the harassment was inadequate. We disagree.

Subdivisions (1) and (8) of § 46a-60 (a) prohibit an employer or its agents from discharging, discriminating against or harassing an employee on the basis of sex. In defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to § 46a-60. E.g., *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 469–70, 559 A.2d 1120 (1989). "Although the language of [Title VII of the Civil Rights Act of 1964, § 703 (a) (1); 42 U.S.C. § 2000e-2 (a)][29] and that of the Connecticut statute differ slightly, it is clear that the intent of the legislature in adopting 1967 Public Acts, No. 426 . . . which extended the provisions of the Fair Employment Practices Act . . . to prohibit discrimination on the basis of sex . . . was to make the Connecticut statute coextensive with the federal [statute]." (Internal quotation marks omitted.) *State* v. *Commission on Human Rights & Opportunities*, supra, 469–70.

We look to federal case law for guidance, first, in determining the appropriate standard of review. Although there is some disagreement among the federal courts as to whether determinations under Title VII represent questions of fact or mixed questions of fact

---

[29] Section 2000e-2 (a) of title 42 of the United States Code provides: "It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

and law, most courts, including the Second Circuit Court of Appeals, apply a clearly erroneous standard to review such a claim. See, e.g., *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 154 (2d Cir. 1997) (trial court's finding that employer took prompt and appropriate corrective action in response to plaintiff's complaint was not clearly erroneous); *Rodgers* v. *Western-Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993) (existence of racial harassment in hostile work environment claim involves application of facts to law and thus clearly erroneous standard applies); *Sauers* v. *Salt Lake County*, 1 F.3d 1122, 1126 (10th Cir. 1993) (applying clearly erroneous standard to trial court's finding of no sexual harassment); *Cortes* v. *Maxus Exploration Co.*, 977 F.2d 195, 198 (5th Cir. 1992) (same); *Craig* v. *Y & Y Snacks, Inc.*, 721 F.2d 77, 79 (3d Cir. 1983) ("[i]n sexual harassment cases, where there are frequently serious credibility issues, we are bound to accept the trial court's findings, as we are in all Title VII cases, unless they are clearly erroneous"). But see *Intlekofer* v. *Turnage*, 973 F.2d 773, 777 (9th Cir. 1992) (question of whether remedial action was appropriate is mixed question of fact and law requiring de novo review). In light of the fact-bound nature of determinations regarding the efficacy of an employer's response to illegal harassment by one or more of its employees, we agree that a clearly erroneous standard is appropriate for our review of the trial court's findings. "A finding . . . is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 616, 711 A.2d 688 (1998).

Traditionally, a claim of sexual harassment under federal law has proceeded "on one of two theories: (1)

quid pro quo—e.g., favorable treatment in return for sought sexual favors[30]—or (2) hostile work environment." *Gallagher* v. *Delaney*, 139 F.3d 338, 346 (2d Cir. 1998); see *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 751–52, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). To establish a claim of hostile work environment, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

---

[30] Although this case was brought alleging a hostile work environment caused by the plaintiff's coworkers, it is worthy of note that the United States Supreme Court, in two recently issued opinions, has clarified the standards for imputing liability to an employer for certain harassing conduct on the part of a *supervisor*, reducing, to some extent, the importance of the distinction between the two theories for sexual harassment claims. *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher* v. *Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). Historically, the lower federal courts had held an employer vicariously liable if an employee established a quid pro quo claim. *Burlington Industries, Inc.* v. *Ellerth*, supra, 751–52. In *Ellerth*, the court addressed the issue of whether an employer also may be held vicariously liable for a supervisor's harassment "where the plaintiff employee has neither submitted to the sexual advances of the alleged harasser nor suffered any tangible effects on the compensation, terms, conditions or privileges of employment as a consequence of a refusal to submit to those advances?" (Internal quotation marks omitted.) Id., 753. The court rejected the notion that "the categories *quid pro quo* and hostile work environment, will be controlling on the issue of vicarious liability." (Emphasis in original.) Id., 754. The court, instead, held: "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." (Citation omitted.) Id., 765; accord *Faragher* v. *Boca Raton*, supra, 807–808. The court, however, did not alter the standards for establishing a hostile work environment or for imputing liability to an employer for a *coworker's* harassing conduct.

employment and create an abusive working environment . . . . *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) . . . ." (Internal quotation marks omitted.) *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). "[I]n order to be actionable . . . a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. . . . [W]hether an environment is sufficiently hostile or abusive [is determined] by looking at all the circumstances . . . ." (Citations omitted; internal quotation marks omitted.) *Faragher* v. *Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

"A plaintiff pursuing a hostile work environment claim must establish a basis, rooted in common law agency principles, on which to hold an employer liable for the conduct of its employees. See *Meritor Sav[ings] Bank, FSB* v. *Vinson*, 477 U.S. 57, 72, 106 S. Ct. 2379, 2408, 91 L. Ed. 2d 49 (1986)." *Gallagher* v. *Delaney*, supra, 139 F.3d 348. "The law is clear that an employer may not stand by and allow an employee to be subjected to a course of . . . [sexual] harassment by co-workers . . . ." (Internal quotation marks omitted.) *Torres* v. *Pisano*, 116 F.3d 625, 636 (2d Cir. 1997). Accordingly, an employer will be held liable for harassment perpetrated by its employees if "the employer provided no reasonable avenue for complaint, *or* . . . the employer knew (or should have known) of the harassment but unreasonably failed to stop it."[31] (Emphasis in original;

---

[31] We note that the trial court, in setting forth the legal principles governing an employer's remedial obligation, variously referred to the standard for imputing liability as the failure to take "prompt remedial action," "inaction or lack of adequate action," and doing "little or nothing" about the harassment. Notwithstanding the seeming inconsistencies among these articulations, the plaintiff, at oral argument, expressly disavowed any claim that the trial court had applied an improper legal standard.

internal quotation marks omitted.) *Gallagher* v. *Delaney*, supra, 348. Put another way, "once an employer has knowledge of a racially [or sexually] combative atmosphere in the work-place, he [or she] has a duty to take reasonable steps to eliminate it." *Snell* v. *Suffolk County*, 782 F.2d 1094, 1104 (2d Cir. 1986).[32] "The standard is essentially a negligence one . . . and reasonableness . . . depends among other things on the gravity of the harassment alleged"; (internal quotation marks omitted) *Torres* v. *Pisano*, supra, 638; "the severity and persistence of the harassment . . . and . . . the effectiveness of any initial remedial steps"; *Hirras* v. *National R. Passenger Corp.*, 95 F.3d 396, 400 (5th Cir. 1996); and "the nature of the work environment . . . and the resources available to the employer." (Citation omitted.) *Snell* v. *Suffolk County*, supra, 1104. An employer's response should be evaluated to determine how "prompt, appropriate, and adequate" it was. *Gallagher* v. *Delaney*, supra, 348. "[T]o determine whether the remedial action was adequate, we must consider whether the action was reasonably calculated to prevent further harassment." (Internal quotation marks omitted.) *Knabe* v. *Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997). "[O]nce an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think [it] can be charged with discriminating on the basis of race [or sex]." (Internal quotation marks omitted.) *Snell* v. *Suffolk County*, supra, 1104. "Whether an employer has fulfilled [its] responsibility [to take reasonable steps to remedy a

---

[32] The United States Supreme Court recently observed that "[United States] Courts of Appeals in sexual harassment cases have properly drawn on standards developed in cases involving racial harassment. . . . Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment." (Citations omitted.) *Faragher* v. *Boca Raton*, supra, 524 U.S. 787 n.1.

discriminatory work environment] is to be determined upon the facts in each case." Id.

The plaintiff's challenge to the adequacy of the defendant's response to her complaints of harassment is predicated on two claims: (1) the defendant's investigations of the plaintiff's complaints were neither prompt nor sufficiently thorough; and (2) the remedial measures taken by the defendant, consisting of generalized written and verbal warnings to staff and offers to transfer the plaintiff to a different correctional institution, were insufficient. We disagree.

Guided by the principles set forth in the federal cases discussed above, we turn, first, to the defendant's course of action following the plaintiff's August, 1991 complaint. We conclude that the trial court's determination that the defendant had taken adequate remedial measures to investigate and remedy the harassment was not clearly erroneous. The defendant responded promptly when the plaintiff reported to Lieutenant Moore that Trimmer, one of the inmates, had told her that an officer or officers had made inappropriate comments concerning the plaintiff's sexuality. Moore immediately questioned several officers about the matter, none of whom provided her with any information likely to have assisted her in developing leads upon which further investigation might have been predicated. In addition, Major Langner, immediately upon his receipt of the incident reports prepared by the plaintiff and Moore, questioned Trimmer, but Trimmer refused to disclose the identity of the officer who, he claimed, had made the offensive comments about the plaintiff's sexuality. Moreover, Langner testified that, based on his professional experience, he had decided not to interview any other inmates because he was concerned that to do so would only exacerbate the problem.[33] Langner

---

[33] The plaintiff adduced no evidence challenging Langner's judgment in deciding not to interview other inmates.

then apprised Deputy Warden Arasimowicz of the rumors, and Arasimowicz promptly issued a reminder to all staff concerning the "consequences of any 'harassing' statements or actions made to or about fellow staff [persons]." By the end of August, 1991, when the plaintiff met with Arasimowicz, she informed him that conditions had improved. The plaintiff made no additional complaints concerning harassing conduct until March, 1992.

The plaintiff nevertheless contends that the defendant failed to do enough to ascertain the identify of the officers purportedly responsible for originating or spreading the malicious rumors. In particular, the plaintiff claims that, at a minimum, the defendant should have interviewed inmates and officers in Trimmer's cellblock. The plaintiff also emphasizes that the defendant failed to relay the information regarding the sexually offensive rumors to the affirmative action unit or to internal affairs, either of which, she claims, likely would have conducted a more thorough investigation of her complaint.[34]

"[T]he law does not require that investigations into sexual harassment complaints be perfect." *Knabe* v. *Boury Corp.*, supra, 114 F.3d 412. "The question before us is not whether the *investigation* was adequate . . . but rather whether the *remedial action* was adequate." (Emphasis added.) Id. Nevertheless, we agree with the plaintiff that, inasmuch as the choice of an appropriate remedial measure often will depend upon information

---

[34] The plaintiff also underscores that fact that the defendant, at that time, "did not even have an official policy against sexual harassment . . . ." "However, there is no basis for a per se rule that the absence of a written sexual harassment policy, standing alone, permits a finding that the employer has failed to provide [a] reasonable avenue for complaint or that the employer knew of the harassment but did nothing about it." (Internal quotation marks omitted.) *Reed* v. *A.W. Lawrence & Co.*, 95 F.3d 1170, 1180 (2d Cir. 1996).

gathered through an investigation, it is appropriate to consider the nature and scope of an employer's investigation when evaluating the adequacy of its response to the harassment. Moreover, we acknowledge that "there may be cases in which an employer's investigation is so flawed that it could not be said that the remedial action was adequate. For example, the investigation might be carried out in a way that prevents the discovery of serious and significant harassment by an employee such that the remedy chosen by the employer could not be held to be reasonably calculated to prevent the harassment." Id., 414. Thus, an employer cannot insulate itself from responsibility for failing to take effective remedial action by claiming that it was unable to confirm the existence of harassment in circumstances in which it made little effort to do so. In a case such as the present one, however, which involves comments by uncooperative inmates and staff and harassment that consisted primarily of rumormongering, much of it by unidentified persons, it is likely that the employer will have a difficult time tracing the harassment to its source.[35]

We do not agree, therefore, that, in this case, the scope of the defendant's investigation of the plaintiff's August, 1991 complaint called into question the defendant's good faith or precluded the defendant from taking appropriate remedial measures. After reasonable efforts to identify the inmates and officers responsible for the rumors about the plaintiff were unsuccessful, the defendant immediately issued a strongly worded warning to staff that sexual harassment would not be tolerated. Furthermore, the plaintiff had ready access to supervisory personnel in the event of a recurrence of the harassment. Indeed, the plaintiff periodically

---

[35] That the spreading of rumors and gossip in a maximum security prison is likely to be more difficult to address than similar conduct in a more traditional work environment cannot be reasonably disputed.

inquired of her supervisors whether they had heard any additional rumors, and they informed her that they had not. Significantly, the plaintiff did not file another report concerning an incident of harassment until April, 1992. We are persuaded, therefore, that the trial court was justified in concluding that the remedial measures the defendant had taken in response to the plaintiff's initial complaint were reasonable.[36]

We turn next to the actions taken by the defendant following the plaintiff's filing of her second harassment complaint in April, 1992. Although the adequacy of the defendant's response to this complaint presents a closer question, we conclude that the trial court's determination with respect to that response was supported by the record.

The plaintiff contends, first, that the investigation conducted by the defendant was deficient because it

---

[36] In support of her claim that the defendant's investigation was inadequate, the plaintiff cites to several cases involving harassment investigations that, she claims, were more extensive than that of the defendant, but in which the court, nonetheless, found them to be insufficient. See *Amirmokri* v. *Baltimore Gas & Electric Co.*, 60 F.3d 1126, 1131–32 (4th Cir. 1995) (trial court's summary judgment in favor of defendant employer reversed on appeal because genuine issues of fact existed as to whether defendant's investigation of harassment was sufficient); *Fuller* v. *Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995) (trial court's judgment in favor of defendant employer reversed because evidence definitively established that employer's investigation was seriously flawed); *Carr* v. *Allison Gas Turbine Division, General Motors Corp.*, 32 F.3d 1007, 1012 (7th Cir. 1994) (same); *Steiner* v. *Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994), cert. denied, 513 U.S. 1082, 115 S. Ct. 733, 130 L. Ed. 2d 636 (1995) (same). The responses of the employers in these cases, however, bear little similarity to the investigative efforts undertaken by the defendant. Therefore, we find no support for the plaintiff's claim in these cases.

The plaintiff also compares the scope of the investigation in this case to the more extensive investigation conducted by the employer in *Hirras* v. *National R. Passenger Corp.*, supra, 95 F.3d 396, which a panel of the Fifth Circuit Court of Appeals determined to be adequate. We reject any claim, however, that the scope of the investigation conducted in *Hirras* establishes a floor below which an investigation will be deemed to be inadequate. The determination of whether an investigation is reasonable will necessarily depend on all of the facts and circumstances of the particular case.

was neither promptly undertaken nor thoroughly executed. She maintains that the defendant's failure to conduct any interviews until three months after her complaint was filed conclusively establishes that the defendant's response was insufficient. She also challenges the scope of the defendant's investigation, noting, in particular, the defendant's failure to interview all of the officers, including Felton, with whom the plaintiff had attended the training academy, because it was apparent that the rumors regarding her sexuality had originated there. Finally, the plaintiff argues that the defendant, through the use of disciplinary measures, had the means to break the "code of silence" allegedly employed by members of the defendant's staff in an attempt to defeat the investigation.

Although the affirmative action unit interviewed numerous persons identified by the plaintiff as possible sources of information, there were, as the trial court observed, "weaknesses in the defendant's responses to the harassment." One such weakness was the affirmative action unit's unexplained delay in investigating the plaintiff's complaint. We agree with the plaintiff that "[a] slow response may be perceived as a reluctant response and call into question the bona fides of an employer's anti-harassment program." (Internal quotation marks omitted.) *Payton* v. *New Jersey Turnpike Authority*, 148 N.J. 524, 537, 691 A.2d 321 (1997). Among other things, a delayed response creates a risk that persons with knowledge of the harassment might not be able to remember details about the offensive conduct that would be helpful in identifying the responsible party or parties. The trial court noted, however, that "all correction officers interviewed denied their own active involvement and could not or *would not* recall specifically others who had spread rumors or made comments." (Emphasis added.) Consequently, the trial court expressly found that "it is doubtful whether more

prompt action would have yielded better results," thereby providing support for the defendant's contention that the three month delay in initiating the interviews was not a material factor in the defendant's lack of success in unearthing the source of the harassing comments and rumors. Moreover, in light of the provisions of the union contract governing discipline, it is by no means clear that the defendant had any meaningful recourse against staff members who were suspected of being less than forthcoming but whose statements could not be proven to be false.

Furthermore, the defendant's response to the plaintiff's second complaint was not limited to the actions taken by the affirmative action unit. At the end of March, 1992, when officer Gibson told the plaintiff that officers Felton and Barnes had made inappropriate comments to inmates concerning the plaintiff's sexuality, the plaintiff, on April 1, reported Gibson's comment to Major Pizighelli. The plaintiff followed up her oral report with a written statement on April 22 that detailed six separate instances of harassment over the preceding eighteen months. At that time, however, the plaintiff did not provide Pizighelli with any names. Later in April, when the plaintiff did provide Pizighelli with the names of three employees, namely, Gibson, Barnes and Flores, who might be able to identify the person or persons responsible for the rumors, Pizighelli interviewed all three within one week. Moreover, Franklin, the inmate who had called the plaintiff a "half-man," was disciplined for his offensive comment. Finally, the plaintiff, upon her return to work in May, 1992, initially was assigned to a position that did not require direct inmate contact.

It is appropriate, when considering the adequacy of the investigative steps taken by an employer, to evaluate the measures that an employer *might* have taken but did not. Although it appears that the defendant could

have expanded its investigation to include interviews with members of the plaintiff's training academy class, it is by no means clear, in light of the passage of time between the completion of training in August, 1990, and the conclusion of the defendant's investigation in August, 1992, that questioning the plaintiff's class members about the rumors would have advanced the defendant's investigation. We note, moreover, that the plaintiff failed to adduce testimony from any of her training academy classmates to establish that, if questioned about the rumors in a timely fashion, one or more of them could have been helpful in identifying the source of the rumors. Finally, the record is silent as to whether officer Felton, who was absent from work on workers' compensation leave, was available to be interviewed. Even assuming Felton's availability, however, he had not been at work for a considerable period of time when the plaintiff made her second complaint, and, consequently, it is doubtful that he could have provided any significant assistance to the defendant regarding the rumors or comments made after his departure from the correctional center.

We emphasize that sexual harassment in the workplace is intolerable, and an employer has a serious legal obligation to conduct a reasonably thorough investigation of a harassment complaint. An employer's response to such harassment, however, must be considered in its totality; see *Snell* v. *Suffolk County*, supra, 782 F.2d 1105; and its reasonableness viewed in the context of the nature of the harassing conduct. In light of all of the remedial measures taken by the defendant in response to the plaintiff's complaint, and in view of the fact that the sexual harassment consisted of rumors and innuendo spread by uncooperative prison inmates and staff, we cannot say, notwithstanding certain infirmities in the defendant's investigation, that the trial

court's conclusion regarding the adequacy of the defendant's remedial measures was clearly erroneous.

Finally, the plaintiff, in challenging the reasonableness of the remedial measures taken by the defendant following her April, 1992 complaint, asserts that a transfer to another institution was not an acceptable remedy, inasmuch as it would have penalized her rather than her harassers. She also argues that the offer of a transfer came too late because, by August, 1992, she was medically unfit to work in a prison setting. We are not persuaded by the plaintiff's arguments.

We first note that on April 2, the day after the plaintiff made her second complaint, Major Pizighelli issued a notice condemning sexual harassment, which was read at roll call for the succeeding seven days. Because this immediate response to the sexually offensive rumors and comments included an admonition regarding the disciplinary action that would be taken against anyone found to be in violation of the defendant's sexual harassment policies, it constituted a good faith effort by the defendant to address the problem. Because the warnings alone were not likely to put an end to the circulation of rumors and comments concerning the plaintiff,[37] Scott and Garvey of the affirmative action unit told the plaintiff, even before they had completed their report, that they were willing to recommend that the defendant offer the plaintiff a transfer to an institution of her choice. Moreover, their final report included a recommendation that the plaintiff be offered a transfer to one of five enumerated correctional facilities located in New Haven or its environs, all of which were within a reasonable commuting distance for the plaintiff. The defendant made such an offer to the plaintiff, who rejected

---

[37] The fact that inmates as well as staff had made sexually offensive comments reduced the likelihood that warnings to staff about the consequences of sexual harassment would suffice to remedy the situation.

it. Faced with the likelihood that the identities of the inmates and staff responsible for the harassing rumors would not be ascertained quickly, the defendant's offer to transfer the plaintiff to any one of several area facilities was, under the circumstances, an appropriate response reasonably designed to end the harassment. Although we agree that "the victim of sexual harassment should not be punished for the conduct of the harasser"; (internal quotation marks omitted) *Intlekofer* v. *Turnage*, supra, 973 F.2d 780 n.9; by "hav[ing] to work in a less desirable location as a result of the employer's remedial plan"; *Steiner* v. *Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994), cert. denied, 513 U.S. 1082, 115 S. Ct. 733, 130 L. Ed. 2d 636 (1995); in circumstances such as these, in which the identity of the harasser remains unknown despite good faith attempts to ascertain it, relocation of the victim away from the hostile work environment is a reasonable remedial response so long as the victim's transfer, viewed objectively and under all the circumstances, fairly accommodates the legitimate interests and concerns of the victim. The record in this case does not indicate that the transfer options offered to the plaintiff were in any way onerous, punitive or otherwise unreasonable.

We also are not persuaded that the trial court was required to conclude that the defendant's offer of a transfer came too late. Although we do not diminish the psychological effect that the harassment had on the plaintiff, her own suggestion, in August, 1992, to transfer to Camp Hartell seriously undermines her claim that she was unable to work in any prison setting. Moreover, the mere *possibility* that, by virtue of transfers of personnel and inmates among facilities, the rumors might recur at a different institution does not, in light of the other relevant circumstances, compel a conclusion that

the trial court's determination rejecting the plaintiff's claim was clearly erroneous.

## II

The plaintiff also claims that the trial court improperly rejected her claim of constructive discharge. The plaintiff asserts that her decision, in August, 1992, to take a permanent medical leave without pay constitutes a constructive discharge because the defendant, by failing to put an end to the harassment she faced at work for nearly two years, created a work environment so hostile that any reasonable person in her position would have left. We disagree.

"Normally, an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge. . . . Through the use of constructive discharge, the law recognizes that an employee's 'voluntary' resignation may be, in reality, a dismissal by an employer." (Citation omitted; internal quotation marks omitted.) *Seery* v. *Yale-New Haven Hospital*, 17 Conn. App. 532, 540, 554 A.2d 757 (1989). "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily." (Emphasis added.) *Chertkova* v. *Connecticut General Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996); accord *Seery* v. *Yale-New Haven Hospital*, supra, 540. "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." (Internal quotation marks omitted.) *Chertkova* v. *Connecticut General Life Ins. Co.*, supra, 89. Accordingly, "[a] claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign." *Seery* v. *Yale-New Haven Hospital*, supra, 540.

Even if we assume, arguendo, that an employer's failure to remedy a hostile working environment may be considered the intentional *creation* of an intolerable work atmosphere; see, e.g., *Henson* v. *Dundee*, 682 F.2d 897, 907 (11th Cir. 1982) ("when an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of . . . sex . . . the employer has committed a constructive discharge in violation of Title VII" [internal quotation marks omitted]); the plaintiff has not met her burden of establishing an essential element of her claim, namely, the existence of an intolerable work atmosphere that would compel a reasonable person in that situation to resign. Had the plaintiff established that she was given the choice either to continue working with the officers and inmate population at the correctional center or to leave the employ of the defendant, she might well have prevailed on this element of her claim. When the plaintiff left on permanent medical leave, however, she had rejected the defendant's offer of a transfer to any one of several facilities. We cannot say that the likelihood of sexual harassment at these facilities was such that a reasonable person would have felt compelled to leave rather than face the possibility of a recurrence of the harassing conduct. We conclude, therefore, that the record supports the trial court's conclusion that the plaintiff failed to meet her burden of proving a constructive discharge and the trial court's determination in this regard was not clearly erroneous.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN and MCDONALD, Js., concurred.

BERDON, J., dissenting. In light of the gravity of the sexual harassment endured by the plaintiff, Elizabeth Brittell, the severity and persistence of that harassment,

the ineffectiveness of the initial remedial measures taken by the named defendant, the department of correction (defendant), the nature of the plaintiff's work environment at the New Haven Correctional Center (correctional center), and the resources available to the defendant, I conclude the trial court erred by finding that the defendant had taken reasonable steps to remedy the harassment.

Title VII of the Civil Rights Act of 1964 (Title VII) makes employment discrimination based on sex illegal.[1] In 1980, the Equal Employment Opportunity Commission (commission) declared sexual harassment a violation of Title VII.[2] In 1986, the United States Supreme Court confirmed this view by holding in *Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57, 63–69, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986), that sexual harassment, in the form of either quid pro quo harassment, or a hostile work environment, constitutes sex discrimination in violation of Title VII.

I begin by reviewing the trial court's findings, other undisputed facts, and the record as a whole to demonstrate the full extent of the defendant's failure to take reasonable action to remedy the hostile work environment at the correctional center.

(1) In August, 1990, when the plaintiff was assigned to work at the correctional center, the defendant did not have in place an official policy regarding sexual

---

[1] Title 42 of the United States Code § 2000e-2 provides in relevant part: "(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

[2] See Equal Employment Opportunity Commission Compliance Manual (CCH 1980) § 615, ¶3114, p. 3267 (compliance manual). The commission derives its authority to issue guidelines on employment discrimination, including sexual harassment, from 42 U.S.C. § 2000e-16 (b).

harassment. Nor did the defendant's employee hand-book include a section regarding sexual harassment. Pursuant to the commission's 1980 compliance manual, employers were to create an "explicit policy against sexual harassment [and] clearly and regularly communicate [it] to employees and effectively [implement it]" in order to prevent sexual discrimination in the workplace. Compliance Manual, supra, § 615, ¶3114, p. 3282. The defendant's first formal written policy on sexual harassment, administrative directive 2.2, was not formally approved until November 18, 1991. When the policy was published, it was not circulated to the correctional officers, or posted on bulletin boards, or read at roll call meetings.

(2) In August, 1991, the plaintiff notified the defendant that the rumors circulating about her—that she was a "half-man homo"—had made it uncomfortable for her to work at the correctional center. On August 13, 1991, after learning from an inmate in her cellblock, Thomas Trimmer, that one or more of her fellow correctional officers had started and spread these sexually hostile rumors, including the officer "who relieved her when she worked in Charlie Unit,"[3] the plaintiff complained to her immediate supervisor. On the advice of her supervisor, the plaintiff also filed an incident report with Major Thomas Langner regarding Trimmer's comments and similar harassing comments she had heard from inmates since September, 1990.

(3) In late August, 1991, the plaintiff met with the defendant's Deputy Warden Donald Arasimowicz, and informed him that, even though the comments had subsided in her current post in F block, she feared a renewal of such rumors when she received a new assignment in a different cellblock.

---

[3] "Charlie Unit" represents C block at the correctional center.

(4) The defendant took the following action in response to the plaintiff's complaint of sexual harassment: (a) Questioned four correction officers and Trimmer about the rumors; (b) met with the plaintiff to discuss future monitoring of the situation, and to offer her the help of the employee assistance program; and (c) allegedly reminded all staff members "regarding professional conduct and possible consequences of any 'harassing' statements or actions made to or about fellow staff [persons]."[4]

(5) The defendant failed to do the following in response to the plaintiff's complaint: (a) Interview the officer who relieved the plaintiff when she worked in C block; (b) interview other inmates or officers in her current cellblock, F block, to determine if anyone else had heard the rumors; (c) meet with the plaintiff in the fall and winter of 1991 to monitor the situation; (d) provide the plaintiff with a status report, including results of its investigation and steps it had taken to eliminate the sexually hostile work environment; (e) inform the plaintiff's supervisors of the plaintiff's allegations; and (f) call in the affirmative action unit, or internal affairs unit to investigate the plaintiff's allegations.

(6) The harassing comments recurred near the end of March, 1992. At that time, officer Vernetha Gibson informed the plaintiff that officers Tracey Felton and Kenneth Barnes had been making comments to the inmates about the existence and size of the plaintiff's supposed male genitalia. Moreover, on two separate occasions between January, 1992, and March 30, 1992, "she observed a small hermaphroditic figure scratched into [a] wall with the word 'heman' near the guardhouse

---

[4] No documentary evidence of such a reminder or its content was admitted at trial. Moreover, no one, including Arasimowicz and Warden Robert J. Gillis, had any idea about the form or content of the reminder or to whom the reminder was given. Furthermore, there was no testimony as to how many times this message was given to the staff members.

gate, and inside the jail itself, she saw graffiti that she thought pertained to her.

(7) The plaintiff promptly informed Major Mario Pizighelli on April 1, 1992, of her concern that staff members were making comments about her sexuality to other staff members and to inmates.[5] On April 2, Pizighelli issued a notice to all employees that included much of the defendant's sexual harassment policy as set forth in administrative directive 2.2. The notice was read, at some point thereafter, for seven days at roll call. At this time, Pizighelli failed to interview any officers in the plaintiff's current cellblock, or her former cellblock, to determine the validity of the plaintiff's grave concerns.

(8) On April 22, 1992, the plaintiff filed a written complaint with Warden Robert J. Gillis in which she detailed the sexually harassing comments that had been made about her by inmates and unnamed officers in each of her prior assignments over the last one and one-half years. She claimed that these comments placed her in danger and that she should be removed from contact with the general inmate population until the rumors had ceased and the responsible correctional officers had been disciplined. Notwithstanding the clear mandate in administrative directive 2.2 that all administrators at the correctional center were to notify the affirmative action unit of all sexual harassment complaints, Gillis failed to inform the affirmative action unit of the plaintiff's complaint. Compelled by the inaction of the defendant, the plaintiff contacted the unit herself on April 30, 1992, and subsequently filed a formal complaint on May 18.

(9) On April 23, 1992, approximately three weeks after it received the plaintiff's complaint about the

[5] Although Pizighelli replaced Langner, he was not aware that the plaintiff had made a prior complaint in August, 1991, concerning similar harassing comments.

recurrence of rumors spread by various staff members, the defendant issued a memo to the staff—to be read for seven days at roll call—that stated a "good security program presumes that rumors and gossip about individual staff members . . . not be shared with, or discussed in the presence of, inmates."

(10) On or about the same day, the plaintiff was again subjected to harassing comments regarding her sexuality from Douglas Franklin, an inmate, who referred to her as a "half-man bitch." The incident had a devastating effect on the plaintiff, leaving her emotionally distraught. After reporting the incident to her immediate supervisors, she told them she could not continue working in such a hostile work environment, and then she took a leave from the correctional center.

(11) Less than one week later, on April 28, 1992, the plaintiff met with Pizighelli and provided him with the names of three correction officers—Gibson, Barnes and Ricardo Flores—that she believed could identify those responsible for the rumors concerning her sexuality. Up until that point, Pizighelli had not interviewed any of the plaintiff's coworkers. It took Pizighelli more than one week to complete the interview of these three officers.

(12) On May 7, 1992, Pizighelli met with the plaintiff at her request. At this meeting, or one of his earlier meetings with the plaintiff, Pizighelli was notified that he should speak with Felton regarding the origination and/or the spreading of the harassing rumors. Pizighelli, however, never interviewed Felton.

(13) The plaintiff also was placed on sick leave, effective May 9, 1992. While on sick leave, on May 14, 1992, she met with Ana T. Scott and Michelle Garvey of the defendant's affirmative action unit to discuss her sexual harassment complaint. At this meeting, the plaintiff asked Scott and Garvey to interview officers Felton,

Barnes, Paula Matthews, Manuel Ray, Flores and Anthony Storey, as well as some of the supervisors, Lieutenant Carol Moore, Captain Moses Riddick and Captain Dennis Barile about who had originated and/ or circulated the harassing rumors. Scott and Garvey waited until August 6, 1992, to interview persons on the plaintiff's list. Scott and Garvey did not perform any type of investigation into the plaintiff's complaint between May 14 and August 6, 1992, a period of almost three months.

(14) On August 6, 1992, Scott and Garvey finally interviewed some of the persons on the plaintiff's eleven person list: noticeably absent from the one day interview session was Felton, the same person whom Pizighelli had failed to interview, and one of the officers who attended the training academy with the plaintiff.

(15) After conducting these interviews, Scott and Garvey found the harassing rumors had been spread by unnamed officers and that the rumors originated at the academy, and they recommended that Gillis transfer the plaintiff to another institution within reasonable commuting distance of New Haven. They refused to recommend any further action because they stated they could not establish who was responsible for the rumors.

(16) When Gillis received the report of the affirmative action unit he interpreted it to be the close of the investigation. Gillis then met with the plaintiff, and informed her that he could not assure her that the rumors had stopped. He also told her that in the immediate future, she was to be treated "as a member of the regular work force," and "that she would have to return to the regular rotation cycle . . . applicable to all correction officers"—that is, she could no longer work in the guardhouse away from inmates and most of her fellow officers. The plaintiff refused to return to the cellblocks and dormitories of the inmate areas because she felt

too threatened to do the job correctly. She then applied for and was granted unpaid medical leave.

(17) At his final meeting with the plaintiff in August, 1992, Gillis discussed the option of transferring her to another correctional institution. The plaintiff resisted this move because she was worried that the harassment would continue because correction officers and/or inmates from the correctional center would eventually be transferred to her new location.

(18) The plaintiff continued on unpaid medical leave from August 25, 1992 to April, 1994. While on medical leave, the defendant offered her a hardship transfer to one of its facilities in either Cheshire or Niantic. After failing to submit necessary medical documents in April, 1994, the plaintiff was considered to have resigned.

The plaintiff must establish the following five criteria to prove the defendant should be held liable for a hostile work environment: "(1) she belongs to a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment . . . and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action." *Hirras* v. *National R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996), citing *Jones* v. *Flagship International*, 793 F.2d 714, 719–20 (5th Cir. 1986), cert. denied, 479 U.S. 1065, 107 S. Ct. 952, 93 L. Ed. 2d 1001 (1987). The trial court found that the plaintiff established the first four criteria, but not the fifth. Therefore, as the majority correctly points out, the plaintiff bears the burden on appeal of proving that the trial court's determination that the defendant had taken reasonable steps to eliminate the harassment was clearly erroneous.

The reasonableness of the defendant's remedial actions in a sexual harassment case depends upon several factors. The most relevant factors for our analysis

of this case are: (1) " 'the frequency of the discriminatory conduct' "; *Faragher* v. *Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), quoting *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); (2) "the severity and persistence of the harassment"; *Hirras* v. *National R. Passenger Corp.*, supra, 95 F.3d 400; (3) " 'the effectiveness of any initial remedial steps' "; id.; (4) "the nature of the work environment"; *Snell* v. *Suffolk County*, 782 F.2d 1094, 1104 (2d Cir. 1986); and (5) "the resources available to the employer." Id. I will review each factor seriatim.

The harassment reported by the plaintiff was frequent and of the utmost gravity. Gillis testified that by causing and perpetuating this harassment of the plaintiff, his employees had created "one of the most serious security issues that can develop in a correctional institution." Moreover, Gillis and Arasimowicz knew as early as August, 1991, that the rumors had affected the plaintiff's psyche and that she was worried they would recur in her next assignment and that she would have a difficult time gaining the respect of the inmates in another cellblock. Furthermore, Pizighelli testified that, in May, 1992, the plaintiff was very distraught and had lost confidence in her ability to perform her duties as a result of the sexual harassment. Indeed, Storey informed Scott and Garvey of the affirmative action unit in August, 1992, that he thought the plaintiff's life would be endangered if she were assigned to a cellblock again.

The harassment was severe and persistent. First, the trial court concluded that the sexual harassment was severe or pervasive enough to alter the conditions of the plaintiff's employment and to create an abusive working environment. Second, the plaintiff offered medical testimony that her prolonged exposure to harassment initiated by her fellow officers had caused her severe or moderately severe mental depression that

precluded her return to the correctional institution environment. Indeed, Mark Rubenstein, the plaintiff's psychiatrist, testified that her condition would necessitate a lifetime of treatment by psychotherapy and medication. Third, and most importantly, the pervasiveness of the harassment was so evident that the trial court found that, even if the plaintiff worked out of sight of the inmates, she could not have returned to the correctional center in August, 1992.

The defendant's initial remedial steps did not eliminate the hostile working environment at the correctional center. Although the law does not require that an employer's response to a sexual harassment complaint be perfect; *Knabe* v. *Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997); it does require the response to be adequate. Although the trial court found that the rumors had subsided for a period of time after the August, 1981 incident, it never found that the hostile environment had ceased at any point. Less than seven months after she first complained of the harassment, the plaintiff was confronted with graffiti and a cartoon that she felt were directed toward her alleged "half-man homo" status. The plaintiff also was informed by a fellow officer that two other officers were spreading rumors about the existence and size of her supposed male genitalia. Moreover, nine months after the plaintiff filed her first complaint, and one month after she filed her second complaint, the harassment had become so severe that the plaintiff was given permission to take a temporary medical leave of absence. Furthermore, three months after the plaintiff filed her second complaint, the defendant conceded to her that it had not and could not stop the harassing rumors. Indeed, the defendant's decision to transfer the plaintiff to another correctional facility after receiving the affirmative action unit's finding of a hostile working environment at the correctional center was an implicit admission that, because its remedial

actions were inadequate, it had to remove her to another location.

The nature of the plaintiff's work environment at the correctional center, a maximum security prison staffed by persons who adhered to a code of silence, does not excuse the defendant for its slow and inadequate responses to the plaintiff's complaints. An employer cannot sit back and wait for complaints from its employees. *Hansel* v. *Public Service Co.*, 778 F. Sup. 1126, 1133 (D. Colo. 1991). It was the defendant's duty to conduct an investigation, not the plaintiff's.[6] Once the defendant learned of the plaintiff's claim of harassment, it had an obligation "to investigate whether acts conducive to the creation of an atmosphere of hostility did in fact occur . . . ." *Watts* v. *New York City Police Dept.*, 724 F. Sup. 99, 108 (S.D.N.Y. 1989). A delayed and meager investigation of an employee's sexual harassment complaint has an insidious effect on the work environment. "A slow response may be perceived as a reluctant response and call into question the bona fides of an employer's anti-harassment program." (Internal quotation marks omitted.) *Payton* v. *New Jersey Turnpike Authority*, 148 N.J. 524, 537, 691 A.2d 321 (1997). Nevertheless, at all times after the plaintiff filed her first complaint, the defendant delayed extensive investigations into the plaintiff's complaints until she came forward with the names of the specific officers and supervisors allegedly involved. For example, it did not interview anybody after she filed her second complaint until she came forward four weeks later with the names of three officers. Even so, however, the defendant did not always act on the plaintiff's leads.[7] Furthermore,

---

[6] A complainant, such as the plaintiff, cannot be expected to conduct her own investigation of the harassment because it could possibly expose her to more hostility from her coworkers.

[7] Pizighelli and the affirmative action unit failed to interview Felton, even though he attended the training academy with the plaintiff, and the defendant knew or had reason to know that the rumors originated at the academy.

the defendant took no action to eliminate the known harassment when the plaintiff was on her temporary sick leave in May, 1992. It waited for the affirmative action unit's report, a report that would not be issued for more than three months.

The defendant's remedial actions were not reasonable because it did not utilize all the resources available to eliminate the sexual harassment inflicted on the plaintiff. First, the defendant failed to disseminate a formal policy on sexual harassment prior to the plaintiff's first complaint of sexual harassment. Consequently, its employees, supervisors and officers alike, were not fully aware of the severity of the plaintiff's initial claims in August, 1991. Moreover, because the statement was not tied to an established policy, or to the clear disciplinary guidelines of the employee manual or of Title VII discrimination cases, most employees probably did not understand the importance of the defendant's statement.

Second, the defendant never sought to have the affirmative action unit, a unit designed to respond to complaints of discrimination, investigate the plaintiff's complaints. In a work environment like a prison, where it is essential to maintain security and confidentiality, the harassment investigation "should be conducted by someone outside the concerned department, such as a personnel manager, or even [from] outside the [defendant], such as an outside counsel. Both the alleged harasser and his victims should be interviewed and written statements obtained. Other employees with knowledge should be interviewed and statements obtained from them as well. Confidentiality must be maintained during this process. A detailed report, which includes a recommendation, should be prepared by the investigator. Finally, the results of the investigation should be communicated to both the complainant and the victim." H. Comisky, " 'Prompt and Effective

Remedial Action?' What Must an Employer Do to Avoid Liability for 'Hostile Work Environment' Sexual Harassment?" 8 Lab. Law. 181, 199–200 (1992). Noticeably, the defendant did not seek outside help to conduct its investigation of the plaintiff's complaints. It was the plaintiff herself who sought help from the affirmative action unit. Moreover, the defendant did not issue results of its initial investigation in August, 1991, to the plaintiff.

Finally, the defendant abdicated its responsibility to preserve confidentiality in the investigative process. The defendant knew that one of the inmates, Trimmer, had implicated one or more officers in C block in spreading the harassing rumors. The defendant, however, refused to interview any officers or inmates in C block to verify this allegation. According to Langner, it was not reasonable to interview staff and/or inmates about Trimmer's allegation because "they may start talking to someone else about the subject and other people may hear what is going on. . . . It is just something you wouldn't want to put in anybody's ears but the person or people involved in the incident itself." It is illogical and inconsistent with the goals of Title VII for the defendant to justify its inadequate investigation of the plaintiff's complaint that harassing rumors were being spread by a fellow officer by arguing that a more thorough investigation would have resulted in more rumors being spread. Because it is the employer's responsibility to remedy harassment in the workplace, it is equally the employer's responsibility to prevent harassment from arising in the investigative process.

In conclusion, the defendant's actions failed to satisfy either of "the twin purposes of ending the current harassment and deterring future harassment—by the same offender or others." *Fuller* v. *Oakland*, 47 F.3d 1522, 1528–29 (9th Cir. 1995). Because the defendant's

chosen remedies were ineffectual, it should be held liable for the hostile work environment. I would reverse the judgment of the trial court and remand this case for further proceedings to determine the plaintiff's damages.

Accordingly, I dissent.