[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case, the plaintiff, Connie Grant, appeals the dismissal by the defendant, Commission on Human Rights and Opportunities ("CHRO"), of her employment discrimination complaint against the defendant, GMAC Financial Services ("GMAC"), the plaintiff's employer. This appeal is brought pursuant to General Statutes §§ 46a-83a, 46a-94a, 4-183.
The record reflects the following relevant facts. GMAC provides financial services for General Motors dealerships worldwide. (Return of Record ("ROR"), p. 224.) The plaintiff began employment in New Haven with CT Page 9716 GMAC on April 18, 1988, as an account representative. (ROR, pp. 64, 222, 224.) While the plaintiff subsequently held other positions, she was in the position of account representative when she filed her CHRO complaint. (ROR, p. 196.) She was under the direct supervision of David Diggs, credit supervisor, who is black, Gary Cable, Credit Manager and Ken Weyman, Assistant Control Branch Manager who are both white. (ROR, p. 224.)
While her performance was generally satisfactory, the plaintiff had attendance problems throughout her time at GMAC. Her review of February 28, 1989, rated her as "competent," but did note that she needed to improve her attendance and tardiness. (ROR, pp. 218, 220.) Her review for March 1, 1989 to February 28, 1990 observed "excessive absenteeism." (ROR, p. 214.) Her review of 1990 also noted these difficulties and concluded: "[I]f improvement is not seen in the 2 performance problem areas a PIP[1] program may be implemented." (ROR, p. 212.) Likewise, the plaintiff's review for March 1, 1991 to February 29, 1992 commented on her failure to be at work when expected. (ROR, p. 206.) At this time, there were also two other performance difficulties, cooperation with supervisors and coworkers, and making excessive personal telephone calls. (ROR, pp. 115-16, 206.)
Based on these personnel problems, GMAC imposed a performance improvement plan ("PIP") on the plaintiff on June 17, 1992, to bring her performance to a satisfactory level. (ROR, p. 196.) The PIP designed for the plaintiff included daily monitoring of the plaintiff's start time and telephone calls, a weekly review of the plaintiff's assignments by her supervisor to insure that instructions were being followed, and a monthly meeting with management. (Supplemental Return of Record ("Supplemental ROR"), p. 53.) This plan was carried out until mid-September of 1992, mostly under the direction of the plaintiff's immediate supervisor, David Diggs. During the period July 20, 1992 to July 24, 1992, the assistant branch manager, Ken Weyman, sat next to the plaintiff making notes and observing the plaintiff. (Supplemental ROR, pp. 81-82.)
After monitoring the plaintiff through September 16, 1992, the PIP was lifted with the concurrence of her supervisors. (Supplemental ROR, pp. 57-60.) Her overall performance was rated as "Good, competent." (Supplemental ROR, pp. 58-60.) On December 14, 1992, approximately three months after the PIP had been lifted, the plaintiff requested and received from GMAC a leave for educational purposes from December 28, 1992 to December 28, 1993. (Supplemental ROR, p. 83.) The record indicates that the plaintiff, by her own admission, was never demoted, suspended or terminated by GMAC and that she left GMAC voluntarily. (Supplemental ROR, p. 83.) CT Page 9717
On July 15, 1992, the plaintiff filed a complaint with CHRO, alleging that she was discriminated against because of her race and color (black) by GMAC. (ROR, pp. 64-66.) She claimed that she was "constructively discharged" by GMAC's selective enforcement of personnel rules and the imposition on her of the PIP. (ROR, p. 65.) By letter dated January 19, 1996, CHRO advised the parties that it intended to conduct a fact-finding session pursuant to General Statutes § 46a-83 (c), and scheduled the session for March 6, 1996. (ROR, p. 93-94.)
Following the fact-finding session, the CHRO dismissed the plaintiff's complaint on December 30, 1996 on the ground that there was no reasonable cause to believe that GMAC had committed a discriminatory practice. (ROR, pp. 41-49.) After the denial of a request for reconsideration, the plaintiff commenced her appeal to this court. (ROR, pp. 1-5.)
On May 5, 1997, the plaintiff filed with this court an application for leave to present additional evidence. Subsequently, the CHRO and the plaintiff agreed that the return of record filed by CHRO was defective and reached an agreement on means of correcting the record. The issue of retaliation was also to be more fully explored. (Supplemental ROR, pp. 113-14.) The Court, McWeeny, J., accepted this agreement on December 14, 1998 and remanded the matter to CHRO, retaining jurisdiction over the appeal under General Statutes § 4-183 (h).
On remand, the case was noticed for a fact-finding conference on July 12, 1999. (Supplemental ROR pp. 96-97.) The plaintiff, however, did not attend this conference and requested permission to submit a written statement, which the CHRO allowed. (Supplemental ROR, pp. 88, 92.) When the plaintiff submitted her statement, CHRO's investigator attempted to reschedule another fact-finding conference. September 28, 1999 was selected but neither the plaintiff nor her attorney appeared. (Supplemental ROR, pp. 47, 64, 66, 67, 70-71.)
The plaintiff submitted another statement and was interviewed by telephone. (Supplemental ROR, pp. 38-43.) The CHRO provided the plaintiff with the documents introduced by GMAC at the fact-finding session and a tape recording of the testimony. (Supplemental ROR, pp. 47-60.) The plaintiff provided a rebuttal statement dated October 14, 1999. (Supplemental ROR, pp. 32-36, 38-43.)
The investigator for CHRO concluded that the plaintiff had not been discriminated against and drafted a no reasonable cause finding for the parties review and comment. (Supplemental ROR, pp. 20-25.) On November 19, 1999, CHRO received an objection to the draft finding from the plaintiff. (Supplemental ROR, pp. 15-16.) CHRO did not change the investigator's conclusions, (Supplemental ROR, pp. 2-14), and notice of CT Page 9718 the final decision was mailed to the parties on November 30, 1999. (Supplemental ROR, p. 1.)
The appeal was again assumed by this court. Briefs were filed by all parties and the case was scheduled for oral argument on the merits for July 19, 2000.[2] On that date, the parties waived oral argument and agreed that the court should decide the appeal based on the parties' briefs and the administrative record.
At the outset, the court notes the "standard of review for all of the plaintiff's claims on appeal. Because [the court is] reviewing the decision of an administrative agency, [the court's] review is highly deferential. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law. . . ." (Citations omitted; internal quotation marks omitted.)Bezzini v. Dept. of Social Services, 49 Conn. App. 432, 436 (1998).
In the present case, the plaintiff first challenges the investigation by the CHRO of her discrimination complaint. Specifically, the plaintiff contends that the CHRO was required to make a finding of reasonable cause or no reasonable cause within a year of the filing of her complaint. (Plaintiff's Brief, p 3.) In support of this argument, the plaintiff relies on a correspondence sent by the CHRO. Accordingly to the plaintiff, she filed her CHRO complaint on July 15, 1992 and a finding of no probable cause was rendered on December 5, 1996, more than four and one-half years after the filing of her complaint.
In making this contention, the plaintiff, however, ignores the decisions and legislation that followed Angelsea Productions, Inc. v.Commission on Human Rights Opportunities, 236 Conn. 681 (1996). InAngelsea, the Supreme Court held that all pending decisions that did not comply with the time deadlines before the CHRO were to be dismissed. In 1996, the general assembly enacted validating legislation to remedy theAngelsea result. See Public Act 1996, No. 96-241 § 1. That legislation gave the CHRO jurisdiction over any complaint filed on or before January 1, 1996, which had not been resolved and which the CHRO CT Page 9719 would have had jurisdiction but for its failure to comply with statutory time requirements. The only limit placed on CHRO's jurisdiction was that the agency "issue a determination of reasonable or no reasonable cause on any such complaint not later than January 1, 1997." P.A. 96-241.
Here, the plaintiff acknowledges that her complaint was filed with the CHRO on July 15, 1992, thus meeting the first requirement of P.A. 96-241. The CHRO issued its decision of no reasonable cause on December 6, 1996, thus meeting the second requirement of P.A. 96-241. Contrary to the plaintiff's argument, the CHRO complied with its statutory duty to issue a finding on her complaint by January 1, 1997. Since the law was complied with, the plaintiff's timeliness argument fails. Truglia v.Commission on Human Rights Opportunities, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 554068 (April 7, 1997, McWeeny, J.)
The plaintiff next contends that the CHRO's investigation, which led to the finding of no reasonable cause, was inadequate. For complaints that survive the merit assessment review process set forth in General Statutes § 46a-83 (b), subsection (c) of that statute allows the CHRO to determine through mediation sessions, fact-finding conferences or complete investigations "if there is reasonable cause for believing that a discriminatory practice has been or is being committed as alleged the complaint." That subsection defines reasonable cause as "a bona fide belief that the material issues of fact are such that a person of ordinary caution, prudence and judgement could believe the facts alleged in the complaint." This standard requires the CHRO to consider all reliable, probative evidence both favorable and unfavorable to the plaintiff. Adriani v. Commission on Human Rights Opportunities,220 Conn. 307, 316-17 (1991).
In reviewing a CHRO determination, the scope of review to be exercised by this court is limited. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . ." (Citations omitted; internal quotation marks omitted.)Dufraine v. Commission on Human Rights Opportunities, 236 Conn. 250,259 (1996). "The substantial evidence standard is satisfied if the record provides a substantial basis of fact from which the fact in issue can be reasonably inferred. . . ." (Citations omitted; internal quotation marks omitted.) Id., 260.
Here, the CHRO noticed the parties of a fact-finding conference to be held on March 6, 1996, and also that CHRO would "assist both parties in securing the testimony of any person as a witness. . . ." (ROR, pp. 93-94.) CT Page 9720 On remand, at least two other fact-finding conferences were attempted. (Supplemental ROR, pp. 46, 66, 96-97.) While live witnesses did not appear at these fact-finding sessions, the CHRO had statements from a majority of the plaintiff's witnesses.
While the plaintiff objects to the CHRO dismissing her complaint without hearing her witnesses, it was plaintiff's responsibility to come forward with witnesses to support her position. This requirement is set forth in § 46a-54-68 (a) of Regulations of Connecticut State Agencies, which provides: "The Complainant . . . has a duty to provide any and all information . . . which relates to any contested allegation of the complaint." Furthermore, the plaintiff never took advantage of CHRO's offer to subpoena witnesses to the fact-finding sessions. As CHRO has pointed out, these witnesses lived in Connecticut and were available. In Ierardi v. Commission on Human Rights Opportunities,
Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 276369 (February 24, 1986, Corrigan, J.), aff'd.,15 Conn. App. 569, cert. denied, 209 Conn. 813 (1988), the court stated:
 Apparently the plaintiff felt that his participation in the investigation was the mere staging of deductive reasoning and the supplying of forty-six names of possible witnesses. . . . Obviously, the plaintiff relied on the investigator to produce the evidence. However, that was the burden of the plaintiff.
Finally, the court in Carr v. Commission on Human Rights andOpportunities, Superior Court, judicial district of Danbury, Docket No. 326518 (April 2, 1998, Mihalakos, J.) stated: "Nowhere in § 46a-83
(b) or (c) does it state that witnesses must be interviewed in order to determine reasonable cause." Here, the CHRO did have statements of most of plaintiff's witnesses.
The plaintiff also faults CHRO for not interviewing her prior to the fact-finding conference. (Plaintiff's Brief, p. 4.) The record reflects that such an interview did take place both before and after the initial fact-finding conference. (ROR, pp. 151, 153, 159-61; Supplemental ROR, p. 13.)
In addition, the plaintiff submitted numerous statements and rebuttals to the positions of GMAC. (ROR, pp. 84-88, 143-45, 155-57; Supplemental ROR, pp. 38-43, 80-83.) The attorney for the plaintiff contacted CHRO. (ROR, pp. 10-11, 78-79, 98-100; Supplemental ROR, p. 16.) The CHRO satisfied its duty to look into the plaintiff's charges of discrimination by allowing her to submit numerous written statements. Truglia v.Commission on Human Rights Opportunities, supra, Superior Court, Docket CT Page 9721 No. 554068. The court concludes that based on the record as a whole that the CHRO had conducted an adequate investigation at the time the finding of no reasonable cause was made.
The remaining issue is whether there is substantial evidence in the record to support the CHRO's findings that the plaintiff was not constructively discharged or subjected to retaliation.
"In reviewing decisions made by an administrative agency, a reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial. . . ." (Citations omitted; internal quotation marks omitted.) Adriani v. Commission on Human Rights and Opportunities,228 Conn. 545, 550 (1994). "In determining whether an administrative finding is supported by substantial evidence, the reviewing court must defer to the agency's assessment of the credibility of witnesses. . . . Ultimately, the question is not whether the trial court would have reached the same conclusion but whether the record before the agency supports the action taken. . . ." (Citations omitted; internal quotation marks omitted.) Levy v. Commission on Human Rights Opportunities,236 Conn. 96, 98-99 n. 3 (1996).
A constructive discharge occurs "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. . . . Accordingly, [a] claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign." (Citations omitted; internal quotation marks omitted.) Brittellv. Department of Correction, 247 Conn. 148, 178 (1998); see also Appletonv. Board of Education, 53 Conn. App. 252, 261 (1999)
In the present case, the record contains substantial evidence to support the CHRO's conclusion that there was no constructive discharge. (Supplemental ROR, pp. 10, 13.) The imposition of the PIP by GMAC was a legitimate business decision to remedy the plaintiff's job performance problems and was not imposed harshly or offensively. The plaintiff remained as an employee for some six months after the imposition of the PIP. During the PIP process, GMAC made comments both favorably and unfavorably to the plaintiff, and the PIP was not used as an attempt to discharge the plaintiff. Equally important, the plaintiff was permitted by GMAC to have an educational leave with the possibility of being rehired. The record therefore shows that the plaintiff did not suffer CT Page 9722 conditions so intolerable that no reasonable person would continue employment, but that she left on her own terms. (Supplemental ROR, p. 83.)
To claim a prima facie case of retaliation under General Statutes § 46a-60, the plaintiff would have had to prove the following: (1) she was engaged in a protected activity; (2) GMAC was aware of this activity; (3) GMAC took adverse action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. See also Newtown v. Shell Oil Company,52 F. Sup.2d 366, 375 (D. Conn. 1999) (interpreting both Title VII and CHRO law).
The CHRO correctly concluded that the plaintiff had not made out a prima facie case of retaliation. The record indicates that there was no negative economic consequences for the plaintiff. The close observations by Weyman, the credit manager, did not result in a loss of pay. The PIP program was eventually lifted with Weyman's consent. Weyman's observances most likely helped the plaintiff to improve her performance and aided the eventual removal of the PIP. She told CHRO that she left GMAC voluntarily, on her "own terms." (Supplemental ROR, p. 81-83.)
In addition, there is no evidence of any causal connection between the plaintiff's filing of her CHRO complaint and Weyman's observations of her performance. Grant's performance was observed by both Weyman and her immediate supervisor Diggs pursuant to the PIP, which was established one month prior to the plaintiff's filing of her complaint with CHRO. Because the institution of the PIP, which the plaintiff knew involved close monitoring, predated the filing of the plaintiff's complaint with the CHRO, the actions of Weyman and enforcement of the PIP cannot be retaliatory. (Supplemental ROR, p. 12.) Equally important, another employee under monitoring received the identical scrutiny from Weyman. (Supplemental ROR, p. 35.)
Since the finding of no reasonable cause by CHRO is supported by substantial evidence, the plaintiff's appeal is hereby dismissed.
Henry S. Cohn, Judge