[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a complaint in one count alleging discriminatory and retaliatory conduct by the defendant, State of Connecticut Department of Transportation (DOT) in violation of the Connecticut Fair Employment Practices Act (CFEPA), C.G.S. § 46a-58, et. seq. The defendant pleads two affirmative defenses: 1) that the defendant properly investigated and responded to plaintiff's complaints of hostile work environment; 2) that the plaintiff fails to state a claim upon which relief may be granted. The facts are as follows:
The plaintiff was hired by DOT to be an airport police officer at the Groton-New London airport (Groton) starting on February 3, 1995. Prior to that she had worked for five years as an airport police officer at Bradley International Airport (Bradley). At Bradley the airport police are employees of the Department of Public Safety.
Groton-New London airport operates on a smaller scale then Bradley. During the period from 1995 to 1997 Groton accepted about eight commercial flights a day. During that time period Bradley accepted over CT Page 600 100 commercial flights a day. Groton occupies 400 acres of land. At Bradley there are 30 to 40 air-crash-rescue firefighters, and a police troop with 30 or more members. Half of Bradley's police troop are State Troopers. The other half are airport police officers under the supervision of the State Troopers.
Groton is the only location where DOT hires airport police officers. For this location DOT has six to seven airport police officer positions, a sergeant position, and a fire captain position.
While working at Bradley the plaintiff had been asked by the then airport manager at Groton, Gary Schmid to apply for an airport police officer position at Groton. She applied, was interviewed, was offered the position and accepted it. The plaintiff and Francis Dudley came on as airport police officers at Groton on the same day. During the first six months there were no problems between herself, Gary Schmid, or Dudley.
In July 1995 Schmid began a six-month "officer-in-charge" rotation, whereby each airport officer would serve as the "officer-in-charge" for a month. The purpose of this was to evaluate the officers' supervisory potential for the airport police unit. During this rotation period, the relationship between the plaintiff and Dudley changed. Each became aware that both were interested in the position of sergeant. The plaintiff felt that Dudley behaved differently toward her once he knew she was interested in the sergeant position. Dudley and Schmid continued their close association but the plaintiff was no longer a part of that.
From December 1995 to January 1996, the plaintiff became officer-in-charge under the rotation system. As officer-in-charge she wrote-up Dudley for policy violations regarding carrying his personal firearm, altering his uniform, and providing 24 hours notice for a vacation day rather than 48 hours notice.
The rotation process highlighted the personality conflicts in the unit, with the officers collectively complaining about whoever was in charge. Dudley began to clash with his fellow officers more particularly Officers Stephen Dubin, Thomas Ormsby and Captain Cynthia Lewis. There was the perception at this time that Dudley was being groomed by Schmid for the Sergeant's position.
In December of 1995 Ormsby complained about Dudley to DOT personnel. Ormsby subsequently had his attorney write to DOT presenting the reasons that Ormsby should be promoted to Sergeant of Groton and complaining about instances of harassment, intimidation and retaliation directed toward Ormsby by Schmid. CT Page 601
In December 1995, Dubin and Dudley had an exchange of words after which Dudley "racked" his shotgun in an intimidating fashion. Three weeks later Dubin reported the incident to the Plaintiff. The Plaintiff reported this to Schmid.
On January 22, 1996 Schmid recommended to DOT management that Dudley's police officer position be "reclassified" to a police sergeant's position. The reclassification request was approved by The Bureau Chief of the Bureau of Aviation and Ports. The request was sent to the DOT personnel office. The aviation administrator of The Bureau of Aviation 
Ports, Kenneth Robert, was not consulted on the proposed promotion.
Plaintiff discovered a draft of Schmid's recommendation memorandum on the airport computer. She contacted DOT's Affirmative Action Office and spoke with Edward Marcos, an affirmative action officer, expressing her concerns about Dudley as intimidating and a violator of procedures, who was favored by the airport manager. Marcos undertook an investigation speaking to Officers Ormsby, Kondratowicz, Dubin and Captain Lewis. Each expressed concern about Dudley's personality problems and the proposed promotion.
Marcos reported his preliminary findings to Kenneth Robert on January 30, 1996. These were that he found present severe morale deterioration and the performance of duties in jeopardy. Two days later Kenneth Robert held a meeting at Groton with Marcos, Stephen Markwald from DOT's Personnel Office, and Schmid to discus the complaints. At that time the decision was made to conduct a background check on Dudley. Prior employers noted Dudley performed his duties well. One strongly recommended Dudley's promotion. Another strongly recommended DOT not promote Dudley.
In view of the complaints and background check Dudley's reclassification was reconsidered. Marcos prepared an "options" paper for Robert's consideration. Options ranged from promoting Dudley, to promoting the most senior officer on the force, to postponing the selection process altogether. Marcos recommended promoting the most senior officer on the police force which at the time was Officer Cowley. Marcos thought Groton needed an experienced officer as its supervisor.
Robert and Marcos also met with the Plaintiff and Captain Lewis on March 5, 1996 to discuss their concerns about Schmid and Dudley. In his report Marcos referred to this meeting as a bitch session. Within three days of this meeting Robert met with Schmid. Thereafter, responding to the concerns brought to his attention, Robert conducted his own three-day investigation at Groton. He interviewed both DOT employees and tenants of the airport. Robert discovered several areas of concern regarding airport CT Page 602 management. He discovered a lack of civility between the airport police, that they were sniping at each other. He found there was no unit cohesion.
As to claims about Dudley's alleged intimidating behavior, one tenant who was alleged to be having problems reported that he did not have any problems. Another tenant declined to provide a written complaint on Dudley. Robert found no evidence that Dudley had physically threatened or touched anyone. What Robert discovered was that personnel at Groton were in disarray, a situation he blamed on Schmid, the airport manager.
As a result of the investigations it was decided that Dudley should not be promoted to the sergeant's position and Robert rescinded the request to reclassify Dudley's police officer position to a sergeant's position. Following this Dudley went on sick leave from February 27, 1996 to June 10, 1996 because of psychiatric problems. Schmid was reprimanded for his close personal relationship with Dudley and the perception that Schmid was playing favorites. As a further result of his investigation Robert asked the sergeant from Bradley to conduct a policies and procedures audit of Groton. A detailed report covering all aspects of Groton's operations and the policies and procedures covering them was issued on May 24, 1996. Schmid was instructed by Robert to implement all recommendations contained in that report. This report had been preceded by a lengthy memorandum from Robert to Schmid in which he detailed problems he had identified in his four week investigation which he attributed to Schmid's lack of supervisory, conflict management and communication skills. In addition to arranging for Schmid to attend three in-service training courses focusing on these skills, Robert had Schmid immediately designate Crowley, who was the most senior officer, as officer-in-charge and Airport Security Officer. Cowley was to remain in that position until the decision on the Sergeant position was finalized. In addition to the eleven directives dealing with operational improvements contained in this memo from Robert to Schmid, Schmid was instructed to devote serious efforts to improving staff morale by heeding specified guidelines. Robert also required Schmid to apologize in writing to plaintiff and Captain Lewis for telling someone at the Department of Mental Health that they were lesbians.
DOT required Dudley to be cleared by an independent state police psychiatrist as fit for duty before he was permitted to return. Dudley's own treating psychiatrist recommended that he be reintegrated by a graduated scheduled. DOT did this. A few weeks after Dudley returned to work on a half time basis Captain Lewis transferred to Bradley. The transfer was effective the end of August, 1996. Schmid resigned as manager of Groton effective June 21, 1996. CT Page 603
Upon Dudley's return to full-time duty the latter part of July, 1996, Dudley had a verbal confrontation with Officer Stephen Dubin, in front of William Reber, an airport tenant. Dubin reported this incident to his supervisor officer-in-charge Cowley the next day and to Captain Lewis four weeks later. Cowley gave Dudley a verbal warning and opined in his memorandum to Robert that it would take a long time to bring harmony to this work site; that the wounds were deeply rooted; that some officers still found it difficult to deal with Dudley, as Dudley felt it was to deal with them.
On August 15 and 16, Dudley drove out of the airport during his shift changes with plaintiff without providing her with an oral reports as to what happened during his shift. In a memorandum copied to Dudley, plaintiff and Captain Lewis both reported the behavior to Robert, and Lewis requested a fact finding concerning the incidents. On August 21, 1996, Robert scheduled a fact finding to deal with that issue and at the same time issued a written reprimand to Dudley for his failure to communicate with the on-coming officer at shift change.
On August 17, 1996, Plaintiff and Officer Kondratowicz were coming off-shift as Dudley was coming on shift. Plaintiff reported to Marcos of Affirmative Action on August 19, 1996, two days later, that Dudley had placed his hand on his gun and stared at her as she walked out of the room.
In the morning of August 19, 1996, Captain Lewis asked plaintiff to accompany her so Lewis could deliver two "write-ups" to Dudley. After Lewis handed him the pages and walked away, Plaintiff and Lewis heard the sound of Dudley moving his leather utility belt, with his hand on his weapon, still holstered, and his baton. Lewis called Robert's office. Robert returned her call from his car phone and proceeded to Groton. The state police were called by Robert or Lewis. A state trooper investigated the matter within two hours of the incident. The state trooper found that there were no direct threats made toward either plaintiff or Lewis, that Dudley had not committed any criminal conduct and so informed Robert.
Two days after the state police investigation, Robert scheduled a fact-finding hearing for the following week against Dudley. The hearing encompassed the July 24, August 4, 15, 16 and 19, 1996 allegations of Dudley making threatening gestures toward fellow employees, failure to follow airport and fire security procedures, and exhibiting a lack of respect and dignity toward fellow employees. Dudley hired Attorney John Kelly to represent him at the fact-finding. The fact-finding took place on September 20, 1996. Dudley was represented by his own counsel. The Union president and a union steward attended as observers. Captain Lewis, Officers Cowly, Dubin, Kondratowicz, Taylor, Secretary Justine CT Page 604 Francese and airport tenant William Reber gave statements regarding the July and August 1996 incidents with Dudley. Robert questioned each witness first, after which Attorney Kelly asked his questions on behalf of Dudley.
Each of the witnesses were unhappy with the nature and tenor of Attorney Kelly's questioning. Captain Lewis and the Plaintiff found it highly offensive that Attorney Kelly had asked them about the nature of their relationship, suggesting to them by this question that they were lesbians, and also asking the plaintiff whether she was referred to as the "Bradley bitch". All participants found Attorney Kelly's manner of questioning to be oppressive. However, neither the observers nor Robert saw any problem with the manner in which the hearing was proceeding.
After the fact-finding Robert concluded that Dudley had not threatened his co-workers, but as a result of the fact-finding, determined that the personality clashes at Groton had evolved to a point where little cohesive, productive work could be expected to be accomplished. Robert recommended that every member of the police unit be required to attend training sessions in workplace relationships; and, if no improvement in interpersonal relationships was detected thereafter, he recommended disbanding the unit and replacing the security function with contracted services.
A consulting firm called "Make It Work" was hired by DOT to provide team building and interpersonal relationship training for the staff at Groton. Kelly Huffman from Make It Work interviewed all of the staff. After her initial assessment she informed DOT that team building and interpersonal relationship training would not be appropriate at Groton because the rifts were too deep-seated.
Robert explored the possibility of having a state trooper assigned to Groton to supervise the police unit. The union rejected the suggestion.
After the September 20, 1996 fact-finding both plaintiff and Dudley requested to be placed on the transfer list, to be considered for positions outside of DOT. After the factfinding plaintiff was fearful for her physical safety but admitted that she told no one in DOT management about her fears and concerns. After the fact-finding, plaintiff did not bring any further complaints to either affirmative action or to Robert.
After the September, 1996 fact-finding Plaintiff confronted her then supervisor Bruce Costick, who had asked two tenants whether they had personal relationships with her. Plaintiff attributes that rumor to Dudley. Plaintiff did not register a complaint to Costick's supervisors, anyone in DOT management, to DOT affirmative action or to Robert about CT Page 605 Costick's inquiries.
After the September, 1996, fact-finding plaintiff complained to her immediate supervisor that Dudley was making inappropriate log entries in January and February 1997. The Plaintiff represented that on one occasion when she called in sick to work, Dudley wrote in the log book that she sounded really sick. The Plaintiff took this to be a sarcastic remark pointing out that when male employees called in sick Dudley frequently didn't write it in the log book; nor, did he write in the log book if they were late, but did do this if she was late. Plaintiff also pointed out that one time when in the station alone she was cold and turned up the heat; and that when Dudley came in he turned down the heat and entered in the log book that he had done so per the Sergeant's requirements. Plaintiff thought the entry was unnecessary and spitefully made. Plaintiff pointed to an entry in the log book where Dudley wrote he had been mandated to work because the Plaintiff was allowed the time off. This was cited as an example of Dudley using the log book to complain when the Plaintiff took earned time off. Plaintiff's Supervisor, Bruce Costick told Dudley to stop the entries.
Two weeks before the first log entry plaintiff, through her attorney, complained to DOT Personnel Officer that Dudley was not working Christmas Day 1996. Dudley subsequently filed a harassment complaint. Plaintiff called out sick for the Christmas Holiday.
On December 31, 1996 Officer-in-charge Cowley retired. Beal, president of the protective services union had suggested to Robert that an experienced sergeant might help address the personnel issues at Groton as she was concerned that none of the current police officers would succeed as sergeant. She thought that an outsider, without any prior history or alliances within the airport unit would have a better chance of success. DOT management decided to seek an experienced sergeant to lead the Groton police unit.
From the several candidates interviewed, Sergeant Bruce Costick was chosen. Costick had been a police officer since 1977, a police sergeant since 1982, and had acted as an acting police lieutenant for over a year. He was highly recommended by his supervisor, Suzanne Cooney. In her letter of January 6, 1997 she termed as excellent his performance in overseeing the Public Safety Department and the Norwich Hospital Campus, which had at the time 800 employees and 300 beds. In dealing with the many challenges presented by seriously ill patients and issues with employees that required public safety department intervention she stated Sergeant Costick conducted himself professionally and with competence.
Although Costick did not have prior experience at an airport, Robert CT Page 606 had determined that the Groton airport police unit had more of a need for an experienced supervisor, rather than airport experience. In his view the particulars of the airport could be easily taught. In December of 1997 all of the police officers including Dudley were technically qualified for the position of Sergeant. However, in light of the long-standing personnel problems in the police unit and the recommendations from the union president, DOT's Affirmative Action Officer, and an outside consultant, DOT decided to seek an experienced sergeant from outside Groton airport rather than to promote from within the police unit.
In January of 1997 DOT hired Catherine Young as airport manager of Groton. Young attended Costick's interview. DOT management wanted her input on a Supervisor that would be reporting to her. In February of 1997 DOT hired Patricia Macek as a police officer at Groton airport. On March 13, 1997 plaintiff transferred to the Department of Mental Health.
Sergeant Costick retired from State service on July 31, 1997. Robert temporarily appointed Macek as officer-in-charge or temporary acting sergeant of the Groton police unit. Due to her performance in the acting capacity, Robert subsequently offered her the opportunity to apply for the position on a permanent basis. Macek declined for personal reasons and not for any reasons involving gender or Officer Dudley. With Macek's declination Robert again sought an experienced Sergeant from outside. Robert again sought union input. From the candidates interviewed David Blanchette was selected. Sergeant Blanchette had 18 years experience as a police officer, 15 years experience as a police sergeant. Blanchette did not have prior airport experience, but he had extensive supervisory experience, had been an emergency medical technician for 12 years and a volunteer fire fighter for 14 years.
The policy of appointing experienced sergeants from outside appeared to be addressing the personnel difficulties in the police unit at Groton. There was a gradual improvement through Costick's and Blanchette's terms.
It is undisputed that the Plaintiff had a good work record and was a person of integrity. She was not characterized as an hysteric or one who constantly complained. Captain Lewis who had transferred to Groton from Bradley arrived the same time as the plaintiff and at Groton supervised plaintiff in her firefighting training, found her to be knowledgeable, motivated, cooperative, one who picked up on things quickly. Service ratings show her history of good performance. In these she is referred to as a team player with a positive attitude; that she showed excellent initiative as evident from the quality and quantity of her work; that she had been a major contributor to the unit's Policies and Procedures CT Page 607 Manual, training program organization and had assisted in developing the airport's security plan.
In addition the plaintiff had eighteen certificates of completion for various classes and seminars she had attended over the years. She had worked six years at Bradley before coming to Groton in February of 1995 where she remained until March of 1997 when she transferred out. After leaving Groton she took a police sergeant's exam on which she received a good score.
The plaintiff has argued two legal standards to support her failure to promote claim, the "mixed motive" test from Price Waterhouse v. Hopkins,490 U.S. 228 (1989); and the "pretext" case from McDonald-Douglas v.Green, 411 U.S. 792 (1973).
A "mixed-motive" case exists when an employment decision is motivated by both legitimate and illegitimate reasons. "In such instances, a plaintiff must demonstrate that the employer's decision was motivated by one or more prohibited statutory factors. Whether through direct evidence or circumstantial evidence, a plaintiff must "submit enough evidence that, if believed, could reasonably allow a [fact finder] to conclude the adverse employment consequences resulted because of an impermissible factor." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1187 (2d Cir. 1992). Under this test the critical inquiry is whether a discriminatory motive was a factor in the decision at the moment it was made. Levy v.Commissioner on Human Rights Opportunities, 236 Conn. 96, 105. "Under this model, the plaintiff's prima facie case requires that the plaintiff prove by a preponderance of the evidence that he or she is within a protected class and that an impermissible factor played a "motivating" or "substantial" role in the employment decision. (citations omitted)" Levy
supra at 106.
"Once the plaintiff has established his prima facie case, the burden of production and persuasion shifts to the defendant. "The defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [the impermissible factor] into account.' (citations omitted)"Levy supra at 106, 107.
The "pretext" McDonnell Douglas-Burdine model of analysis comes into play when a plaintiff cannot prove directly the reasons that motivated an employment decision but nevertheless may establish a prima facie case of discrimination through inference by presenting facts sufficient to remove the most likely bona fide reasons for an employment action. From a showing that an employment decision was not made for legitimate reasons, a fact finder may infer that the decision was made for illegitimate CT Page 608 reasons. Under this model the plaintiff needs to prove four elements by the preponderance of the evidence: (1) that he or she belongs to a protected class; (2) that he or she applied and was qualified for the position in question; (3) that despite his or her qualifications, the individual was rejected; and (4) that after the individual was rejected, the position remained open. Once a plaintiff has established a prima facie case of discrimination, a presumption of discrimination is created. Under this model the burden of persuasion remains with the plaintiff. However, once the plaintiff establishes a prima facie case, "the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating (not proving) some legitimate, nondiscriminatory reasons for the plaintiff's rejection" (citations omitted). Because the plaintiff's initial prima facie case does not require proof of discriminatory intent, the McDonnellDouglas-Burdine model does not shift the burden of persuasion to the defendant. Therefore "the defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.' (citation omitted). Once the defendant offers a legitimate, nondiscriminatory reason, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the proffered reason is pretextual. (citations omitted)" Levy supra at 108.
"The McDonnell Douglas-Burdine analysis keeps the doors of the courts open for persons who are unable initially to establish a discriminatory motive. If a plaintiff, however, establishes a Price Waterhouse prima facie case, thereby proving that an impermissible reason motivated a defendant's employment decision, then the McDonnell Douglas-Burdine model does not apply, and the plaintiff should receive the benefit of the defendant bearing the burden of persuasion." Levy supra at 109.
Accordingly we look first to the Price Waterhouse test. Plaintiff's claim of direct and/or indirect gender discrimination focuses on Marcos's use of the term "strong man" when testifying to the kind of sergeant Groton needed. Marcos explained it could be a "strong woman" that what he felt was needed was a strong supervisor to resolve the personnel problems at Groton. Plaintiff's claim also focuses on the use of the term "bitching session" in Marcos's write up of the March 5, 1996 meeting with plaintiff and Captain Lewis. Marcos was a former marine and stated that back then in the marines the term "bitch session" was synonymous with "gripe session". However, both of Marcos's female supervisors and Robert expressed disapproval of the use of the term. Plaintiff's claim includes complaint by the plaintiff to her supervisor Bruce Costin that Dudley spread rumors that plaintiff was having sex with tenants. Sergeant Costin admitted he had discussed these rumors with the tenants themselves and CT Page 609 upon learning this plaintiff told Costin she was offended by this also. She did not, however, bring the matter of the rumors to the attention of either Ken Robert or Ed Marcos. Finally, the plaintiff cites the failure of Robert to stop what plaintiff terms aggressive questioning at the September 1996 fact finding by Dudley's attorney.
The plaintiff's claim of direct and/or indirect gender discrimination falls far short of making out a prima facie case of such discrimination. None of the above referenced incidents could either together or separately be said to make a showing that the plaintiff was not promoted because she was a woman.
Having determined that the plaintiff has failed to make a prima facie case under the Price Waterhouse test we look to the McDonnell Douglas-Burdine pretext model. This court's factual determination clearly points to very deep seated personality conflict at Groton. There were serious personnel issues at Groton. These came to DOT's attention initially when Schmid, the Airport Manager, advanced Dudley's name for the sergeant position at Groton. DOT undertook an intensive investigation which resulted in Schmid being reprimanded, Dudley's name being withdrawn from consideration, and Dudley going on an extended medical leave. The fact findings conducted as a result of the complaints received further reinforced DOTS concern about the lack of ability of the personnel at Groton to work together in a cohesive fashion. The effort at determining supervisory potential through affording each an opportunity to serve as the "officer-in-charge" for a month long period failed. This rotation process simply brought out the divisions in the police unit. Whoever was in charge would be complained upon by the others. The decision to seek a sergeant with supervisory experience resulted from the personnel issues at Groton.
The president of the protective services union expressed her concern that none of the current police officers at Groton would succeed as sergeant. When Crowley the officer with the longest tenure left, Bruce Costick who had been a police officer since 1977 and a police sergeant since 1982 with established supervisory experience, was brought in. At the time all of the police officers at Groton were technically qualified for the position of sergeant. Dubin had worked as an airport police officer at Groton since 1989 and was interested in being promoted to sergeant. Officer Kondratowicz had worked for DOT since January 1988. However, in view of the longstanding personnel problems in the police unit and the recommendations from the union president, DOT's affirmative action officer, and an outside consultant, DOT sought an experienced sergeant from outside Groton, with supervisory experience.
Following Costick's retirement on July 31, 1997, Officer Macek acted as CT Page 610 a temporary supervisor. She did not apply for the permanent position. DOT again brought in a sergeant from without. Sergeant Blanchette came to Groton with 18 years experience as a police officer, 15 years experience as a police sergeant, with extensive supervisory experience. The policy of appointing experienced sergeants appeared to be addressing the personnel difficulties in the police unit.
This court concludes that there were legitimate nondiscriminatory reasons to seek an experienced sergeant rather than to promote from within the police unit. Nor, has the plaintiff shown that these reasons were false or a pretext for discrimination. Accordingly, we find that the plaintiff has failed to prove by a preponderance of the evidence that DOT's not promoting her to the sergeant position was based on gender discrimination.
We look next to plaintiff's claim that she was subjected to a sexually hostile work environment in violation of the Connecticut Fair Employment Practices Act (CFEPA). Brittell v. Department of Correction, 247 Conn. 148,717 A.2d 1254 (1998) is the most recent definitive statement on that subject. Brittell looked to the federal statutory counterpart to C.G.S. § 46-60 to define the statutory contours of an employer's duties under § 46a-60 (a)(1) and § 46a-60 (a)(8). "To establish a claim of hostile work environment "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment (citations omitted) . . . A plaintiff pursuing a hostile work environment claim must establish a basis, rooted in common law agency principles, on which to hold an employer liable for the conduct of its employees. (citations omitted). Accordingly an employer will be held liable if the employer provided no reasonable avenue for complaint or . . . the employer knew (or should have known) of the harassment but unreasonably failed to stop it.'"Brittell, at 166-167.
The determination of whether the workplace conduct is sufficiently severe and persistent is to be made with regard to the totality of the circumstances. Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2nd Cir. 1998). A variety of factors must be considered by the court including the frequency of the complained of conduct, "whether it is physically threatening or humiliating, or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance." See Distasio at 21-22. These factors must be considered from both a subjective and objective viewpoint. Id.
The incidents complained of must be more than episodic, they must be sufficiently continuous and concerted in order to be termed pervasive. CT Page 611Perry v. Allen, Inc., 115 F.3d 143 (2nd Cir. 1997).
Except for two incidents each almost a year apart, the harassment complained of was not based on gender. The first incident involved the claimed comments by Schmid to someone at the Department of Mental Health that the plaintiff and Captain Lewis were lesbians; and, the inquiry by Costick on information provided by Dudley that the plaintiff had personal relationships with two tenants. As to the first incident Schmid was ordered to send plaintiff and Lewis letters of apology. As to Costick's inquiries the plaintiff did not register a complaint to Costick's supervisors, to anyone in DOT management, to DOT affirmative action or to Robert. Plaintiff talked to Co stick directly and the inquiries ceased.
As to the other of plaintiff's complaints which involved for the most part Dudley, these were followed up promptly by DOT with a series of fact findings which resulted in reprimand issuing, cancellation of Dudley's promotion, tightening controls on adhering to formal policy and procedure involving staff and how they carried out their job responsibility. Finally, a full scale hearing was held as to Dudley's actions and no cause was found for any disciplinary action against him by DOT.
From the facts found it is clear that the plaintiff and Officer Dudley did not like each other. But, from the facts found, his behavior on the job falls far short of creating a hostile environment, i.e., a workplace permeated with discriminatory intimidation, ridicule and insult sufficiently severe or pervasive as to alter the conditions of plaintiff's employment and create an abusive working environment.Brittle, Id.
As for the other prong of the inquiry when dealing with the claim of hostile environment which seeks to hold an employer liable for the conduct of its employees, it is clear that DOT provided a ready and easily accessed avenue for complaints and that every effort was made on its part to deal with concerns or complaints which were brought to DOTs attention or that DOT became aware of through its own inquiries. This court concludes that the plaintiff has not proven her claim of hostile environment.
Since the plaintiff has failed to prove liability as to her claim of failure to promote and as to her claim of hostile environment, the court does not reach the issue of damages. Accordingly judgment may enter in favor of the defendant on the plaintiff's complaint.
Hennessey, Judge. CT Page 612